Alvin HUNTER, Plaintiff-Appellee,

v.

ALLIS–CHALMERS CORPORATION, ENGINE DIVISION, and Andre J. Lambert, Defendants-Appellants.

No. 85–2401.

United States Court of Appeals, Seventh Circuit.

Argued April 15, 1986.

Decided July 30, 1986.

Nina G. Stillman, Vedder, Price, Kaufman & Kammholz, Chicago, Ill., for defendants-appellants.

William J. Sneckenberg, William J. Sneckenberg & Assoc. Ltd., Chicago, Ill., for plaintiff-appellee.

Before WOOD and POSNER, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

POSNER, Circuit Judge.

Allis-Chalmers and one of its supervisory employees, Lambert, appeal from a judgment imposing liability under civil rights law for their having failed to protect Hunter, a black employee at Allis-Chalmers' en-

gine plant in Harvey, Illinois, from racial harassment by his white co-workers, and for having fired him when he filed a complaint about the harassment. The appeal raises a number of issues concerning the sufficiency of the evidence, the conduct of the trial, and the size of the judgment.

Hunter was hired in 1973 as a machinist and in 1978 became an engine tester. There were more than 60 testers, of whom only a small fraction (exactly how small is unclear) were black. Testers were paid on a piecework basis. They received points for each piece of work done, and 125 points entitled them to the base rate; for each additional point they got incentive pay. The testers had agreed among themselves not to exceed 140 points; they were afraid that if they did management would raise their base output quota, thus making them work harder for the same pay. Hunter was a "rate buster," or as it was called in another time and place, a Stakhanovite. He went as high as 190 points. This was greatly resented and other testers told him to stop. The evidence is conflicting as to whether he did; he testified that after being warned, he did not exceed 145 points except on a few occasions when his supervisors wanted greater production. In any event, the white testers harassed him continuously. They would place a glue-like substance on the lock of his tool box, which prevented him from opening it; they hid his tools; they sabotaged the engines he was supposed to test. Racial graffiti blossomed on the walls of the bathroom and on a company bulletin board, saying such things as, "the KKK is not dead, nigger," and "open season on coons." One graffito depicted Hunter having sex with his (male) foreman. Racially derogatory notes were left for Hunter and one of the other black workers to find in their working areas, such as, "Save this mess for the nigger on the second shift." A hangman's noose covered with a black oily substance was found attached to a black worker's testing equipment. Although Hunter complained repeatedly to his supervisors, there is evidence that they failed to take more than half-hearted measures to stop the harass-ment—evidence, indeed, that the general foreman of the testing unit, defendant Lambert, once called a black worker a nigger to his face, often referred to blacks as niggers behind their backs, and acknowledged that the white testers were racists.

After a visit to the plant by Hunter's lawyer in the first week of 1979, and especially after filing a complaint with the Illinois Fair Employment Practices Commission a month later, Hunter, who until then had had a good work record, began receiving disciplinary sanctions. They culminated in his discharge a few weeks later for having falsified test records—that is, for having claimed to have done work which he had not done. There were indeed discrepancies, but there was also evidence that mistakes in test records were common and that except in Hunter's case no tester had ever been disciplined unless he altered records after a supervisor had approved them.

Hunter brought this suit both under section 16 of the Civil Rights Act of 1870, now 42 U.S.C. § 1981 ("All persons ... shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens"), which has been interpreted to forbid racial discrimination in employment, *Johnson v. Railway Express Agency*, 421 U.S. 454, 460, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295 (1975), and under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* Although there are significant differences between these statutes in coverage, procedure, and remedy, the defendants do not argue that there is any substantive difference relevant to this case. Compare *Whiting v. Jackson State University*, 616 F.2d 116, 121 (5th Cir.1980); *Setser v. Novack Investment Co.*, 638 F.2d 1137, 1146–47 (8th Cir.1981); *Lincoln v. Board of Regents*, 697 F.2d 928, 935 n. 6 (11th Cir. 1983).

The section 1981 case was tried to a jury, the Title VII case simultaneously to the judge. The parties agreed to let the judge determine the remedy. The jury

(composed of four whites and one black, the parties having consented under Fed.R. Civ.P. 48 to a jury of five persons) brought in a verdict for Hunter on the section 1981 charge. The judge remarked that she would have reached the same result on the Title VII charge. The pertinence of the observation is not entirely clear, since the jury's verdict would in any event bind the judge on the factual issues common to the two claims. *Lincoln v. Board of Regents, supra,* 697 F.2d at 934. The judge never entered judgment on the Title VII count, and if that count were still pending in the district court we would have to dismiss the appeal for want of a final judgment. 28 U.S.C. § 1291. But since the judge gave Hunter under section 1981 all the relief he claimed under both statutes, probably his Title VII claim became moot and was abandoned; this is the most natural interpretation of the judge's statement that Hunter "has not sought a formal judgment on the Title VII claim." In any event we shall assume the Title VII claim was abandoned, though it would have been better if the district judge had formally dismissed the claim. Again we ask our district judges to avoid creating uncertainty about the finality of the judgments they enter. See *Dimmitt & Owens Financial, Inc. v. United States,* 787 F.2d 1186, 1189–90 (7th Cir. 1986), where a similar loose end was left dangling.

Among the important differences between a Title VII and a section 1981 employment discrimination case (besides the right to jury trial in the latter) is that in a section 1981 case the plaintiff has a right to full common law damages, and to backpay without limit of time, compared to the two-year limit on backpay in Title VII, 42 U.S.C. § 2000e–5(g). The judge awarded Hunter $25,000 for the indignity and stress inflicted by Allis-Chalmers' conduct and $25,000 in punitive damages, as well as $134,000 in backpay (including prejudgment interest) for the five years between the discharge and the trial, a period during which Hunter was almost continuously unemployed. Excluding attorney's fees, the judgment came to $184,000.

1. The first issue is whether the evidence that Hunter was harassed because of his race and then fired in retaliation for complaining about the harassment was sufficient to justify the jury's finding Allis-Chalmers guilty of employment discrimination. The perpetrators of the harassment were Hunter's fellow engine testers; and a company certainly is not liable for every racial slur by a nonsupervisory member of its work force. See, e.g., *Erebia v. Chrysler Plastic Products Corp.,* 772 F.2d 1250, 1254 (6th Cir.1985); *Johnson v. Bunny Bread Co.,* 646 F.2d 1250, 1257 (8th Cir. 1981). Not only is it hard to see how an isolated racial slur could be thought a significant enough event to count as employment discrimination; it is unclear what practical steps an employer could take to purge all racially offensive speech from the workplace. An employer "is not charged by law with discharging all Archie Bunkers in its employ." *Howard v. National Cash Register Co.,* 388 F.Supp. 603, 606 (S.D. Ohio 1975). That would be an unrealistic burden.

But failure to take reasonable steps to prevent a barrage of racist acts, epithets, and threats can make an employer liable if management-level employees knew, or in the exercise of reasonable care should have known, about the campaign of harassment. See, e.g., *Erebia v. Chrysler Plastic Products Corp., supra,* 772 F.2d at 1253–59; *Walker v. Ford Motor Co.,* 684 F.2d 1355, 1358–59 (11th Cir.1982); cf. *Contreras v. Crown Zellerbach Corp.,* 88 Wash.2d 735, 565 P.2d 1173 (1977) (racial harassment in workplace as common law tort of outrage). This principle is sometimes described incorrectly as an application of respondeat superior. See, e.g., *Moffett v. Gene B. Glick Co.,* 621 F.Supp. 244, 270–71 (N.D.Ind.1985). Racial harassment is an intentional wrong, and the doctrine of respondeat superior makes an employer liable only for those intentional wrongs of his employees that are committed in furtherance of the employment; the tortfeasing employee must think (however misguided-

ly) that he is doing the employer's business in committing the wrong. *Lancaster v. Norfolk & Western Ry.*, 773 F.2d 807, 817 (7th Cir.1985). It would be the rare case where racial harassment against a co-worker could be thought by the author of the harassment to help the employer's business.

■ But an employer is directly liable (that is, independently of respondeat superior) for those torts committed against one employee by another, whether or not committed in furtherance of the employer's business, that the employer could have prevented by reasonable care in hiring, supervising, or if necessary firing the tortfeasor. *Lancaster v. Norfolk & Western Ry., supra*, 773 F.2d at 818–19. Consistent with this principle, an employer who has reason to know that one of his employees is being harassed in the workplace by others on grounds of race, sex, religion, or national origin, and does nothing about it, is blameworthy. He is unlikely to know or have reason to know of casual, isolated, and infrequent slurs; it is only when they are so egregious, numerous, and concentrated as to add up to a campaign of harassment that the employer will be culpable for failing to discover what is going on and to take remedial steps. Other grounds for the distinction between the isolated slur and the campaign of harassment are that, the more slurs there are, the more harm they will do to the victim and the more the employer can do about them. He can reduce the frequency of racial slurs markedly, even if not to zero—so long as their frequency is not close to zero to begin with.

So the problem of the isolated racial slur that the employer could not reasonably prevent without continuous and oppressive surveillance of the work force is solved automatically when the employer's liability is based on his culpable inaction in failing to take steps to stop the harassment rather than on the doctrine of respondeat superior. The employer's liability thus is not strict, as it would be under respondeat superior; his only duty is to act reasonably in the circumstances. See *DeGrace v. Rumsfeld*, 614 F.2d 796, 805 (1st Cir.1980).

In this respect harassment by co-workers differs from harassment by supervisors, the issue in the Supreme Court's recent decision in *Meritor Savings Bank v. Vinson*, —— U.S. ——, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Since the acts of a corporation are acts of human beings, to say that the "corporation" has committed some wrong (rather than just that it is liable under the doctrine of respondeat superior for an employee's wrong) simply means that someone at the decision-making level in the corporate hierarchy has committed the wrong; the deliberate act of such a person is the corporation's deliberate act. See *Lancaster v. Norfolk & Western Ry., supra*, 773 F.2d at 820. Whether *his* superiors know or should have known what he did is irrelevant; it becomes relevant only where the wrong is committed by someone below the managerial level. The present case is not one of harassment by a supervisor. Although there is evidence that Lambert himself used racial epithets, Hunter's case against him is based on Lambert's failure to rein in Hunter's co-workers.

■ The evidence of Allis-Chalmers' negligence in not dealing more effectively with what Lambert and his superiors knew to be a vicious campaign of racial harassment against Hunter and other black workers was adequate to support the jury's verdict, and there was also sufficient though contested evidence that the falsification of work records was a pretext for Allis-Chalmers' firing Hunter. It is true that most of the evidence of discrimination consisted of the self-serving testimony of Hunter and another former black worker, Lawery, and of a former white worker, Manola, who had been a union official, who had been fired for threatening a supervisor, and who admitted harboring ill feelings for Allis-Chalmers. It is also true that an arbitrator upheld Hunter's firing, that the Illinois Fair Employment Practices Commission took no action after investigating the incident, and that the state unemployment

compensation board found that Hunter had been fired for cause. Nevertheless the jury was entitled to believe the plaintiff's witnesses rather than the defendants'; and since Allis-Chalmers does not argue that either the arbitrator's decision or any of the administrative decisions precluded the jury (and the district judge) from ruling in Hunter's favor, we need not explore the application of collateral estoppel to the arbitral and administrative findings. See generally *University of Tennessee v. Elliott,* —— U.S. ——, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986).

■ 2. However, the case was close enough that we must consider carefully the alleged errors in the conduct of the trial. A rather trivial one concerns the limitations placed on Allis-Chalmers' attempt to impeach Hunter by means of help-wanted ads. The ads were relevant to whether Hunter had tried to mitigate his damages from being fired by looking for other work (an issue we shall come to later), but the limitation on cross-examination about the ads was within the judge's power under Fed.R.Evid. 403 and 611(a)(2) to cut off repetitious questioning.

■ 3. Allis-Chalmers complains that Manola's testimony about Lambert should have been excluded as hearsay evidence. But evidence such as that Lambert called blacks "niggers" was not used to prove the truth of such utterances (whatever exactly that would mean) but to show what Lambert's racial attitudes were; hence it was direct evidence. Manola was also allowed to testify that Lambert had suspended another black worker for a minor infraction. This was not hearsay evidence either. It was testimony about an act, not about a statement offered for its truth value; and as the union's griever, Manola was testifying to a matter within his competence. Allis-Chalmers' other complaints about Manola's testimony do not require discussion.

4. Allis-Chalmers objects on two grounds to the judge's having let in evidence of harassment against other black workers besides Hunter. The first is that

Rule 404 of the Federal Rules of Evidence forbids using evidence of a defendant's bad acts—whether they are criminal acts, civil wrongs, or other deeds symptomatic of bad character—to show that the defendant committed the acts charged in the current case. See *McCluney v. Jos. Schlitz Brewing Co.,* 728 F.2d 924, 929 (7th Cir.1984). The second is that such evidence has so little relevance, is so inflammatory, and so entangles the case in side issues that it should in any event be excluded under Rule 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence"). See 728 F.2d at 929; *Johnson v. Yellow Freight System, Inc.,* 734 F.2d 1304, 1311 (8th Cir.1984).

■ Taking the second point first, we point out that since Rule 403 expressly commits the issue whether to exclude prejudicial or time-consuming evidence of limited probative value to the discretion of the trial judge, the scope of appellate review of a decision to admit evidence of other discrimination is limited. Given the difficulty of proving employment discrimination—the employer will deny it, and almost every worker has some deficiency on which the employer can plausibly blame the worker's troubles—a flat rule that evidence of other discriminatory acts by or attributable to the employer can never be admitted without violating Rule 403 would be unjustified. Such evidence will often flunk Rule 403 because the acts are remote in time or place, see, e.g., *Moorhouse v. Boeing Co.,* 501 F.Supp. 390, 392–94 (E.D.Pa.), aff'd without opinion, 639 F.2d 774 (3d Cir.1980); but not in all cases, and not in this one. The evidence was relevant both in showing that Allis-Chalmers condoned racial harassment by its workers and in rebutting Allis-Chalmers' defense that it had fired Hunter for cause. The evidence disclosed a strong and persistent pattern of racial hostility that management could hardly have been

unaware of and that increased the probability that Hunter's record-keeping irregularities were merely the pretext for the harsh discipline meted out to him by a management irritated by his complaints about racial harassment.

Rule 404(b) is of doubtful relevance. It refers to the bad acts of the defendant rather than of the defendant's employees. The two sorts of bad act may merge when the defendant's liability is based on respondeat superior, but here it is not. In any event, the rule by its terms allows the admission of evidence of bad acts to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident," and the like—and, therefore to prove that Allis-Chalmers must have known that its white workers were systematically harassing black workers.

The probative value of other discriminatory acts depends not only on their relevance to the acts of which the plaintiff complains but also on the nature of the discrimination charged. If Hunter were complaining that he had been paid less than white workers for the same work, evidence of the discriminatory behavior of his co-workers toward another black worker might have little or no relevance and its probative value (if any) might very well be greatly outweighed by its effect in prejudicing the jury against Allis-Chalmers and spinning out the trial to inordinate length. But because Hunter is complaining that he is a victim of harassment that the company failed to stop and indeed condoned, because as we have said the company's liability under such a theory depends on proof that it acted unreasonably, and because the frequency of misconduct by the victim's co-workers is critical to proof of that unreasonableness, the evidence of discrimination against Lawery was pertinent, perhaps essential, to Hunter's case. The bar of Rule 404 (assuming, as we greatly doubt, that the rule is applicable to evidence of racial harassment by nonsupervisory workers) drops away and the balance in Rule 403 inclines in favor of admission. Certainly the trial judge did not abuse her broad discretion under Rule 403.

5. The judge refused to allow the company to ask Hunter on cross-examination what the Illinois FEPC had done with his complaint to that agency—reject it—after the judge let Hunter testify that he had filed such a complaint. The company argues that the jurors may have confused the filing of the complaint with the possession of a legitimate grievance. This is unlikely, though, since the judge instructed the jury—what was anyway perfectly obvious—that the complaint which Hunter filed in the district court was not evidence of Allis-Chalmers' liability. Complaints are not evidence. Maybe the judge should not have let Hunter testify about making the complaint to the FEPC, but it was material to the issue of retaliatory discharge, and once the testimony was in, it would not have improved matters much to let the company show that the complaint had been rejected. For then Hunter would have been entitled to explore the significance of such a rejection—the FEPC's criteria for taking action on a complaint, the scope of its investigation, etc.—and the parties would have been off on a chase after shadows.

6. We conclude that the district court's judgment on liability should not be disturbed and turn to the damage issues. The first is whether the award to Hunter of $25,000 in compensation for the nonpecuniary harm—the humiliation and distress—of being harassed and then fired on racial grounds was too high. An initial question is the proper standard for appellate review of a district judge's damage assessment. When the jury does the assessing, appellate review is very deferential; the award of damages may be set aside only if grossly excessive. See, e.g., *In re Innovative Construction Systems, Inc.*, 793 F.2d 875, 887 (7th Cir.1986); *Abernathy v. Superior Hardwoods, Inc.*, 704 F.2d 963, 971 (7th Cir.1983). However, in a nonjury case, the judge makes findings of fact, which we must set aside if clearly erroneous; and ascertaining the plaintiff's dam-

ages is a form of factfinding. See, e.g., *Adams Apple Distributing Co. v. Papeleras Reunidas, S.A.,* 773 F.2d 925, 930 (7th Cir.1985); *Lincoln Nat'l Life Ins. Co. v. NCR Corp.,* 772 F.2d 315, 320 (7th Cir. 1985); *United States for Use & Benefit of H & S Industries, Inc. v. F.D. Rich Co.,* 525 F.2d 760, 767 (7th Cir.1975); *Thompson v. National R.R. Passenger Corp.,* 621 F.2d 814, 823 (6th Cir.1980). Yet the judge's determination of the amount of damages is usually reviewed under the same "grossly excessive" standard used in jury cases. See, e.g., *Davis v. Consolidated Rail Corp.,* 788 F.2d 1260, 1263 (7th Cir.1986) (dictum); *Webb v. Arresting Officers,* 749 F.2d 500, 501–02 (8th Cir.1984); *Overton v. United States,* 619 F.2d 1299, 1304 (8th Cir.1980); cf. *Hart v. Walker,* 720 F.2d 1436, 1441–42 (5th Cir.1983). The reason is that the assessment of damages, especially for intangible harms such as humiliation and distress, is inescapably judgmental and subjective to a large degree, and to that degree therefore discretionary; and the scope of appellate review of the discretionary judgments of trial courts is narrow. The appellate court is in no better position to second-guess the trial judge's assessment of the value of such intangibles than it would be to second-guess a jury's assessment. The merger of the abuse of discretion and clearly erroneous standards of appellate review in the context of damage assessment is visible in this court's recent statement that "the district court wields considerable discretion in calculating damages, and its decision is not reversible unless clearly erroneous." *Wheeler v. Snyder Buick, Inc.,* 794 F.2d 1228, 1234 (7th Cir.1986).

The specific award ($25,000) was not grossly excessive. It is not out of line with awards upheld by this and other courts of appeals in similar cases (see, e.g., *Ramsey v. American Air Filter Co.,* 772 F.2d 1303, 1313–14 (7th Cir.1985), and cases cited there; *Stathos v. Bowden,* 728 F.2d 15, 21 (1st Cir.1984))—an important consideration in our review of damage awards. See cases cited in *In re Innovative Construction Systems, Inc., supra,* 793 F.2d at

887 and n. 11. There was the usual and inevitably self-serving testimony by Hunter and his wife about how Hunter's self-esteem was damaged and how his family suffered, but even if much of it is discounted, the fact remains that the treatment to which (the jury found) he had been subjected was very ugly and wounding. If the district judge thought $25,000 a fair monetary equivalent we are in no position to question her judgment; of course it would be different if she had set a much higher amount. See *id.* at 889–90; *Ramsey v. America Air Filter Co., supra,* 772 F.2d at 1313–14; *Douglass v. Hustler Magazine, Inc.,* 769 F.2d 1128, 1144 (7th Cir.1985); *Hollins v. Powell,* 773 F.2d 191, 197 (8th Cir.1985).

7. The award of $25,000 in punitive damages was also within reason. The jury found that Allis-Chalmers had deliberately fired a worker for making well-founded complaints about persistent acts of racial harassment sparked off by the fact that he worked much harder for Allis-Chalmers than most of his white co-workers. It is not easy to say what would be the right amount of punishment for this deliberate wrongdoing by a large enterprise but it is easy to say that $25,000 was not too much.

8. The judge was also right to add prejudgment interest to the award of backpay. Allis-Chalmers cites cases which hold that prejudgment interest is proper only when the amount of damages is fixed or readily computable, as by reference to market value; the classic example is a breach of contract action brought by the payee. See, e.g., *Afram Export Corp. v. Metallurgiki Halyps, S.A.,* 772 F.2d 1358, 1370–71 (7th Cir.1985). Even if the common law rule would not allow prejudgment interest in a case such as the present one, the rule would be inapplicable if inconsistent with the policy of the federal law. *Burnett v. Grattan,* 468 U.S. 42, 104 S.Ct. 2924, 82 L.Ed.2d 36 (1984); see *Wilson v. Garcia,* 471 U.S. 261, 105 S.Ct. 1938, 1942–44, 85 L.Ed.2d 254 (1985); *Sullivan v. Little Hunting Park, Inc.,* 396 U.S. 229,

240, 90 S.Ct. 400, 406, 24 L.Ed.2d 386 (1969). But as a matter of fact Allis-Chalmers misconceives the common law rule. Where a plaintiff asks that prejudgment interest be added to an award of backpay, that rule requires the addition, see Dobbs, Handbook on the Law of Remedies 165–66 (1973), because a wrongful failure to pay wages is the equivalent of the breach of a contract for a fixed sum of money, see *Heiar v. Crawford County*, 746 F.2d 1190, 1201 (7th Cir.1984). It is true as we shall see that some indefiniteness is inherent in a backpay award; it is not always clear how long the employee would have worked had he not been fired, and the wages he earned or could have earned in substitute employment must be subtracted and may not be a definite, readily computable amount. But there is a duty to mitigate damages in a breach of contract action, too, see, e.g., *Cates v. Morgan Portable Building Corp.*, 780 F.2d 683, 688 (7th Cir.1985), and the kind of uncertainties that we have mentioned would not excuse a defendant from having to pay prejudgment interest under common law, cf. *Afram Export Corp. v. Metallurgiki Halyps, S.A., supra*, 772 F.2d at 1371.

The curious thing about cases dealing with the award of prejudgment interest to federal civil rights plaintiffs is that most of the cases treat it as a matter within the discretion of the district judge, even when, as in this case, the principal to which it is sought to be affixed is an award of backpay under a civil rights statute. See, e.g., *Heiar v. Crawford County, supra*, 746 F.2d at 1201, 1202–03; *Taylor v. Philips Industries, Inc.*, 593 F.2d 783, 787 (7th Cir.1979) (per curiam); *EEOC v. Rath Packing Co.*, 787 F.2d 318, 333 (8th Cir. 1986); *Earnhardt v. Commonwealth of Puerto Rico*, 744 F.2d 1, 3 (1st Cir.1984); *EEOC v. Wooster Brush Co. Employees Relief Ass'n*, 727 F.2d 566, 578–79 (6th Cir.1984). The common law rule would, as we have pointed out, award prejudgment interest as a matter of course in such cases. Thus the federal rule treats civil rights (and other federal-question) plaintiffs less generously than plaintiffs in

cases under state law, and it is hard to understand why this should be so and how it could be consistent with 42 U.S.C. § 1988, which provides that "in all cases where [federal civil rights laws] are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies ..., the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such ... cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause...."

Some federal cases hold that prejudgment interest is presumptively due, see, e.g., *EEOC v. County of Erie*, 751 F.2d 79, 81 (2d Cir.1984), and a recent decision by our court under the Comprehensive Employment and Training Act, 29 U.S.C. §§ 801 *et seq.*, states forthrightly that prejudgment interest "is a necessary part" of an award of backpay under the statute, "as it ensures that the timing of the award does not alter its adequacy and that aggrieved parties will not be forced to bear the cost of delay in the dispute-resolution process." *City of Chicago v. United States Dept. of Labor*, 753 F.2d 606, 608 (7th Cir.1985); cf. *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 655 n. 10, 103 S.Ct. 2058, 2062 n. 10, 76 L.Ed.2d 211 (1983). There is merit in this position, since full compensation requires recognition of the time value of money. But we need not decide today how much if any discretion a district judge retains to deny an award of prejudgment interest in a case governed by substantive federal law, since the judge in this case awarded prejudgment interest and in so doing did not abuse her discretion even if she had discretion in the matter, rather than (as implied by *City of Chicago*) an absolute duty. The award of prejudgment interest is necessary to put Hunter in the monetary position he would have occupied if Allis-Chalmers had not violated his rights. Since Allis-Chalmers' misconduct in firing Hunter was deliberate, eq-

uitable considerations even if admissible to contest prejudgment interest do not weigh heavily in its favor.

9. The next issue is the period for which Hunter was entitled to backpay. The judge awarded him backpay for the five years between the time he was fired (1979) and the time of trial, and Allis-Chalmers' initial challenge is that the award should have been cut off no later than 1983 because Hunter failed to prove that he would have been employed beyond then even if he had not been fired in 1979. In 1983 Allis-Chalmers fell on hard times and ordered massive layoffs at the plant where Hunter worked. Two-thirds of the workers employed at the plant were laid off, among them another black engine tester, Lawery, who testified for Hunter at the trial; there is no suggestion that Lawery was laid off for racial reasons. If one knew nothing else about the relative seniority of Lawery and Hunter, the natural assumption would be that Hunter too would have been laid off along with two-thirds of the other workers and therefore that his claim for backpay would stop in 1983. Nevertheless he was allowed to get backpay for the whole pretrial period merely on his testimony that he had had the most seniority on his shift. His shift was the second of three. The shifts were of equal size, and if as is normally the case the more senior workers prefer the first (daytime) shift, Hunter was just below the top third of the workers in seniority and hence would have been laid off; but of course by 1983 he might have accrued enough seniority to move up to the first shift. A further complication is that the effect of seniority often depends on the versatility of one's work skills. Seniority may (and for employees of Allis-Chalmers did) give you the right to bump a less senior worker from a job for which you are qualified. The more jobs you are qualified for, the more likely you are to find a less senior worker whom you can bump. But Hunter had worked in only two jobs for Allis-Chalmers—as a machinist and as an engine tester—and we do not know whether there were any less senior machinists that he could have bumped, giv-

en the massive scale of the layoffs. In any event, for all that appears Hunter was just one step above Lawery in the seniority ladder and would have been laid off at approximately the same time.

Hunter had the burden of proving that the defendants' misconduct caused him to lose all the wages that he claims as backpay, *Horn v. Duke Homes*, 755 F.2d 599, 606 (7th Cir.1985), and whether he put in enough evidence to carry his burden of production and make out a prima facie case for lost wages right up to the date of trial is a nice question—but one we shall not have to decide because an alternative ground urged by Allis-Chalmers requires that the award of backpay be cut off before 1983.

10. The principle of mitigation of damages, or as it is called in tort law "avoidable consequences," requires that a person to whom a wrong has been done take reasonable steps to minimize the harm, on pain of having his award of damages cut down if he does not. See, e.g., *Cates v. Morgan Portable Building Corp., supra;* Farnsworth, Contracts §§ 12.12 and .13 (1982). The test in employment discrimination cases as in other cases is reasonable diligence. See, e.g., *Wheeler v. Snyder Buick, Inc., supra,* 794 F.2d at 1234–35; *Hanna v. American Motors Corp.,* 724 F.2d 1300, 1306–07 (7th Cir. 1984). In the five years between losing his job at Allis-Chalmers and the trial Hunter had very little employment. He did not work at all for the first three and a half years. Later he worked at four jobs, but he left three after a short time (two days, two days, and six weeks, respectively), and the fourth was seasonal. He would not consider moving to the northern suburbs of Chicago or to downstate Illinois. He attended a community college off and on between 1979 and 1981 in an effort to improve his job skills—a laudable objective, but unrealistic, as he had only a D average. In any event, he testified that he kept looking for full-time work throughout this period. Although he might have had difficulty finding a job because of the ground

on which he had been fired (falsifying records), his efforts at seeking work were not sufficiently assiduous to test this hypothesis. A skilled worker, young during the period relevant to this case (he was born in 1950), in good health, he lives only 45 minutes from downtown Chicago, which has one of the largest concentrations of employers in the world; but he could only remember having applied to 16 employers (other than the four he got jobs with) during five years.

 His efforts might have been sufficient if the period of unemployment had been shorter; they were not good enough for five years. Cf. *Sangster v. United Air Lines, Inc.*, 633 F.2d 864, 868 (9th Cir. 1980); *Syvock v. Milwaukee Boiler Mfg. Co.*, 665 F.2d 149, 158–60 (7th Cir.1981); *DeLorean Cadillac, Inc. v. NLRB*, 614 F.2d 554, 555 (6th Cir.1980) (per curiam). You cannot just leave the labor force after being wrongfully discharged, in the hope of someday being made whole by a judgment at law. That is an approximate description of what Hunter did. Although we can reverse the district judge's assessment of Hunter's diligence only if persuaded that it is clearly erroneous—bearing in mind that she had an opportunity to see and listen to Hunter and gauge his sincerity as he recounted his experiences in looking for, getting, and leaving work during the five-year period—and although Allis-Chalmers had the burden of proving Hunter's lack of reasonable diligence, we do not think it possible to conclude that Hunter used reasonable diligence throughout the entire five years for which the district judge awarded him backpay. Even in *Orzel v. City of Wauwatosa Fire Dept.*, 697 F.2d 743, 756–57 (7th Cir.1983), which goes far toward equating reasonable with minimum diligence, the plaintiff, who was 55 years old and had been involuntarily retired (with a pension), was able to obtain a part-time job during a two-year period. See also *Nord v. United States Steel Corp.*, 758 F.2d 1462, 1470–71 (11th Cir.1985). The plaintiff in *Hanna v. American Motors Corp., supra*, was unemployed for four years, but not for want of trying; and unlike Hunter he was

an unskilled laborer (and hence had fewer employment opportunities than Hunter) seeking work in a much smaller job market than Chicago. See 724 F.2d at 1306–10. Giving every benefit of the doubt to the district judge as we must, we nevertheless conclude that the maximum period of unsuccessful search that Hunter can be allowed, consistently with the record and the case law, is three years. At some point people must put their legal troubles behind them and get on with their lives.

11. Another adjustment that Allis-Chalmers seeks—minor in dollars but important in principle—concerns the unemployment benefits that Hunter received when he was fired. The district judge ruled that the benefits ($3,240 by our calculations, but the record is unclear) should not be deducted from the backpay awarded to Hunter. There is an element of paradox in this ruling. Everyone concedes that Hunter must deduct every penny of earnings he had during the backpay period. To let him keep unemployment benefits seems tantamount to punishing work and rewarding leisure. Nevertheless our cases hold that it is within the discretion of the district judge whether to deduct unemployment benefits from backpay. *Horn v. Duke Homes, supra*, 755 F.2d at 607 n. 12; *Orzel v. City of Wauwatosa Fire Dept., supra*, 697 F.2d at 756; *Bowe v. Colgate-Palmolive Co.*, 416 F.2d 711, 721 (7th Cir.1969). The majority of the other circuits, however, hold that unemployment benefits may never be deducted from backpay. See *Craig v. Y & Y Snacks, Inc.*, 721 F.2d 77, 81–85 (3d Cir.1983), and cases cited there. These courts reason by analogy to the collateral-benefits (also known as collateral-source) rule of tort law, whereby a tortfeasor is not allowed to deduct from damages the money that the victim receives by virtue of medical or other insurance that he may carry. Our decisions allowing the deduction of unemployment benefits in Title VII cases may therefore have been undermined by our recent holding that the collateral-benefits rule forbids a deduction for unemployment benefits in a civil rights damage

suit. *Perry v. Larson,* 794 F.2d 279, 285–86 (7th Cir.1986). *Perry* was a suit under 42 U.S.C. § 1983; the present case is under 42 U.S.C. § 1981, but it is not obvious why that should make a difference.

Two of the traditional arguments in favor of the collateral-benefits rule do not seem applicable to unemployment benefits. The first is that one who pays for insurance against an accident should not be forced as it were to donate the proceeds to the person who causes the accident; the second is that one who intends to benefit the accident victim should not be compelled to benefit the injurer instead. The second reason is illustrated by the case of the doctor who donates his services to a patient whom he admires, only to discover that he has not saved the patient any money because the value of the services has been deducted from the damages awarded the patient. As for the first reason, if a person pays a premium entitling him to medical benefits if he is injured, regardless of the source of the injury, then he has paid for a benefit which a tortfeasor should not be allowed to take away from him. Because unemployment insurance is only partially experience-rated, workers and employers in industries that experience little unemployment end up involuntarily subsidizing workers and employers in industries that experience much unemployment. Only in a most artificial sense, therefore, can Hunter be said to have paid for these benefits when he was working for Allis-Chalmers; nor do workers or employers who subsidize the unemployed intend to confer windfall benefits. For a good discussion of these issues in the context of Medicare payments see *Overton v. United States, supra,* 619 F.2d at 1305–09. See generally *Smith v. Office of Personnel Management,* 778 F.2d 258, 263 (5th Cir.1985); *EEOC v. Wyoming Retirement System,* 771 F.2d 1425, 1431–32 (10th Cir.1985); *Naton v. Bank of California,* 649 F.2d 691, 699–700 (9th Cir. 1981); *United Protective Workers of America, Local No. 2 v. Ford Motor Co.,* 223 F.2d 49, 52–54 (7th Cir.1955).

The logical implication of this analysis, however, is not that Allis-Chalmers should get a deduction for unemployment insurance benefits but that Hunter should have to repay them, since he neither paid for them nor was an intended donee. But the ultimate payors of the benefits are a diffuse and unascertainable group, while the state is not asking for the return of the benefits; so the choice seems to be between conferring a windfall on Allis-Chalmers and a windfall on Hunter. As the victim of Allis-Chalmers' wrongdoing, Hunter is the logical choice. Thus this circuit's rule, which allows the district judge in his discretion to deduct or not deduct unemployment benefits in Title VII cases (and, we may assume, substantively similar section 1981 cases), may be unduly favorable to defendants.

However this may be, we do not think the district judge abused her discretion (assuming the matter is discretionary in character) in not allowing Allis-Chalmers to deduct Hunter's unemployment benefits. Remember that at Allis-Chalmers' urging the state's unemployment benefits commission had decided, erroneously in light of the jury's and trial judge's findings in this case, that Hunter was not entitled to the unemployment compensation he had received for the first six weeks after he was fired, because he had been fired for misconduct. Under Illinois' unemployment benefits law, a person discharged from work because of work-related misconduct is ineligible for benefits for six weeks after the discharge. Therefore the amount Hunter had received during this period—$810—was deducted from his subsequent unemployment checks, inflicting a cruel blow to his family's limited finances. To let Hunter keep the remaining unemployment benefits is a crude but not unreasonable recompense.

12. In addition to receiving unemployment benefits, Hunter received a year of welfare benefits at the rate of $430 a month. Since the relationship between any costs incurred by Hunter as a taxpayer and the benefits he and his family received under the welfare program is even more

tenuous than in the case of unemployment insurance, the argument for reimbursing these benefits is even stronger. Allis-Chalmers, however, should not be allowed to deduct the benefits from the judgment, thereby becoming an indirect recipient of welfare. Hunter should be required, upon collection of the judgment, to reimburse the welfare program. But since Allis-Chalmers has not argued on this appeal for the deduction of the welfare (as distinct from unemployment) benefits, and the state is not asking for their reimbursement, the issue is waived.

13. Lambert attempts to raise an issue in a footnote to his appeal brief (which is joint with Allis-Chalmers): "Because of space limitations, Lambert has not reargued in this brief his position that he is not a proper defendant in this case. However, that position is not waived by Lambert and he incorporates by reference into this brief the memoranda filed on his Motion For Judgment On The Pleadings." The issue is waived. Our rules do not permit issues to be preserved by references to documents filed in the district court. *United States ex rel. Mitchell v. Fairman*, 750 F.2d 806, 807 (7th Cir.1984); see also *Prudential Ins. Co. v. Sipula*, 776 F.2d 157, 161 n. 1 (7th Cir.1985). Issues must be argued to be preserved. *Hershinow v. Bonamarte*, 735 F.2d 264, 266 (7th Cir.1984). Lambert's appeal to the page limitation is specious, not only because the appellants could have requested additional space but also because Lambert could have filed a separate brief.

The judgment of liability is upheld, as is the award of compensatory and punitive damages, but the case is remanded for the district judge to recompute backpay (and therefore prejudgment interest), limited to three years in accordance with this opinion. No costs shall be awarded in this court and Circuit Rule 18 shall not apply on remand.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH DIRECTIONS.