Jessie Earl MONTGOMERY, Plaintiff,

v.

CAMPBELL SOUP COMPANY, Defendant.

No. 85C7531.

United States District Court, N.D. Illinois E.D.

Nov. 12, 1986.

Robert S. Harlib, Chicago, Ill., for plaintiff.

Arthur B. Smith, Jr., Philip A. Miscimarra, Murphy Smith & Polk, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Jessie Earl Montgomery ("Montgomery") has sued his former employer, Campbell Soup Company ("Campbell"), alleging Campbell terminated his employment because of his race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17 ("Title VII") and 42 U.S.C. § 1981 ("Section 1981"). Campbell has now moved for summary judgment under Fed.R.Civ.P. ("Rule") 56. For the reasons stated in this memorandum opinion and order, its motion is granted.

### Facts [1]

Campbell manufactures and distributes canned soup and related food products. Two organizational units at Campbell's Chicago plant where Montgomery worked [2] are pertinent to this case: (1) the production area where soups are manufactured, run by Manager of Production Walter Ward ("Ward"), a black,[3] and (2) the warehouse area where finished product is stored and sorted for shipment, run by Manager of Warehouse Richard Barthel ("Barthel"), a white. During the years 1982–84 there were between 660 and 790 Campbell employees (Bechtol Aff. Exs. A–C). About 85 to 88 percent of the hourly-paid workforce (and 73 to 77 percent of the total workforce) was black (*id.* and Bechtol Aff. ¶ 2).

Montgomery, a black, was hired by Campbell June 18, 1984 as an hourly-paid laborer assigned to the warehouse under the supervision of Otis Neighbors ("Neighbors"), also a black (Montgomery Dep. 64–67, 69). Although Montgomery had previously worked for Campbell from 1972 until 1979, he had voluntarily terminated his employment in 1979 after a six-month layoff (Montgomery Dep. 34–37, Exs. 2, 3, 5, 6). Like the other 187 hourly-paid production and maintenance employees hired by Campbell between August 1982 and August 1984 (179 or 97.2% of whom were black), Montgomery was classified as a probationary employee during his first 50 working days (Bechtol Aff. ¶ 3).

Probationary employees work for Campbell on a trial basis (Montgomery Dep. 64, 66) and are subject to dismissal without step-by-step progressive discipline (Bechtol Dep. 18; Koskan Dep. 42–45) if their work is unsatisfactory (Bechtol Dep. 20–21, Ex. 2; Koskan Dep. 43). In addition, like all Campbell employees, they are required to adhere to the "Campbell Soup Company Rules" ("Rules"[4]) (Bechtol Dep. Ex. 5; Koskan Dep. 43–44). Rule 4, of which Montgomery was aware (Montgomery Dep. 67–69), says in part (Bechtol Dep. Ex. 5):

> Watch your break and lunch times. 12 minutes for breaks and ½ hour for lunch.

To permit uninterrupted production each day, employees take their breaks (two each day) and lunch in a staggered manner so "relief" persons may fill in for them (Montgomery Dep. 70–73; Bechtol Dep. 24–26; Wright Dep. 40–42, 65–66). If an employee returns late from a break or lunch, the relief person is delayed in relieving the

---

1. Rule 56 principles impose on the party moving for summary judgment the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, — U.S. —, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). For that purpose this Court must view the evidence in the light most favorable to the nonmovant—in this case Montgomery (*Anderson v. Liberty Lobby, Inc.*, — U.S. —, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986)).

2. All further references to Campbell and its plant are to its Chicago facility.

3. Both Title VII and Section 1981 force courts to be color-conscious rather than colorblind. As a result this opinion is compelled to label people by color—"a black" or "a white."

4. Though the same term is used in this opinion's few references to the Federal Rules of Civil Procedure, both the major difference in the actual numbers involved and the differing contexts of their use in this opinion should avoid any possible confusion.

next individual scheduled to leave production, and all later breaks and lunches are delayed in a kind of domino effect (Montgomery Dep. 72–73; Wright Dep. 92–93; Koskan Dep. 41).

During Montgomery's initial 1972–79 employment with Campbell, he had overstayed his breaks at least two times and was given written warnings (Montgomery Dep. 44, 46–47, 52–57, Exs. 7, 8; Neighbors Dep. 56–57). In addition, Supervisor Koskan ("Koskan"), a white, says he orally counseled Montgomery two or three times for overstaying breaks (Koskan Dep. 51–53). Montgomery recalls working for Koskan during his earlier employment period (Montgomery Aff. ¶ 6).

Although Montgomery was assigned to work under Neighbors in the warehouse when he was rehired by Campbell in 1984, he was temporarily reassigned to various production departments when the need arose (Montgomery Dep. 77–78). One production department to which Montgomery was transferred ten to fifteen times was Department 3–C ("Filling"), where he was under the supervision of Koskan as well as Group Leader James Watson ("Watson"), a black (id. 78–80, 91–92, 95, 97, 105).

According to Montgomery (then 38 years old, id. Ex. 3), he had the following conversation with Koskan on the first day he worked in Department 3–C (id. 81):

> He said how are you. I said pretty good. And I said pretty good. I said how about yourself. And he proceeded to shake my hand. And he asked me what was I doing back in the plant. And I said I have been rehired, and I came back in the plant, you know, to work. And he was still holding my hand, and he said

well, glad to have you back, but if you don't watch yourself, and watch your lunch and breaks, he said, I am going to get rid of all you old blacks that was here before, just as I got rid of your friend Mr. Spoon.[5]

Montgomery claims he told Watson later that same day what Koskan had said, but Watson "just laughed" (id. 84–85).[6] Montgomery also says he told Neighbors, in the presence of Shop Steward Miller ("Miller"), what Koskan had said (id. 85), but Neighbors simply "smiled and went back in his office" and Miller advised Montgomery to "watch [his] step" (id. 85–86).

When Montgomery returned from his first break that day, he claims Koskan told him, in the presence of Watson (who was allegedly laughing) and the relief person, "Rose," that he was ten minutes late (id. 87–88). Montgomery says he responded he was early rather than late, Rose confirmed that fact, and Koskan walked away (id. 88–89; Montgomery Aff. ¶ 9).

Koskan denies all of that. He claims he was watching the clock the first day Montgomery worked in his department and Montgomery was not only five minutes late returning from his first break but also ten minutes late returning from lunch (Koskan Dep. 56–61, Ex. 1). Both times Koskan confronted Montgomery about his tardiness (id. 59–61). Montgomery does not recall speaking to Koskan after lunch and claims he was back early (Montgomery Dep. 90).

Montgomery does remember Koskan falsely accusing him of returning late from lunch on another day in June 1984 (Montgomery Dep. 91–92, 93–94). Consequently Montgomery says he complained to Neigh-

---

**5.** [Footnote by this Court] Montgomery Aff. ¶ 8 offers a somewhat different account of that conversation:

> During our first conversation, Koskan asked me what I was doing back in the plant. I replied that I had been rehired. Koskan then stated that I was entitled to take twelve (12) minutes on my breaks and thirty (30) minutes for lunch. At that time, Koskan told me that he was "going to get rid of all the old blacks that used to work in the plant," but who had been laid off, like myself, in 1979.

> Koskan also stated that I did not "have any business being back in the plant."

Koskan Dep. 55, 59 says he merely said hello to Montgomery and read him the rules and regulations.

**6.** Though Montgomery's testimony is confusing in this respect, he also appears to have said Watson responded Koskan would do what he said he would do—whatever that may have been intended to convey (id. at 84).

bors three or four times that Koskan was picking on him (*id.* 99). Koskan, of course, disagrees. He asserts (a) the date was July 12, 1984, (b) Montgomery returned from his second break thirteen minutes late (Koskan Dep. 64, Ex. 1) and (c) he again gave Montgomery a warning in Watson's presence (*id.* 64, 66, Ex. 1).

Koskan also recalls orally advising Neighbors each time Montgomery was late (*id.* 69–71).[7] Although Campbell's department heads continuously consult one another about the performance of probational employees, Neighbors (as Montgomery's supervisor) had primary responsibility for evaluating Montgomery and making a recommendation as to whether he should be a permanent hire (Barthel Dep. 21–22, 30–3; Bechtol Dep. Ex. 2). Neighbors says he confronted Montgomery about Koskan's reports of tardiness and Montgomery simply said "okay" without denying the truth of the reports (Neighbors Dep. 77–80).

Montgomery alleges Koskan harassed him in other ways as well (Montgomery Dep. 130):

Oh, he would come by and like if the machine is down that I am working on, he would pick the nastiest or the worst thing it is to do and he'd point me out to do it. And he and Watson would stand back and laugh while I would do it. And I'd do it.

However, Montgomery indicated it was not necessarily the black color of his skin that motivated Koskan (*id.* 148):

Q. Did he ride everybody in the department pretty hard, Mr. Koskan?

A. No.

Q. Who has he left off easy?

A. Just about—the people that he liked.

Q. Who does he like, [sic] name them?

A. I can't name them, to tell you the truth. I can't name them.

Q. White or black?

A. Both white and black.

And when Montgomery allegedly complained to the Union Steward about Koskan, Montgomery indicated he did not know the reason Koskan was harassing him (*id.* 99):

I asked him would he ask Mr. Koskan what the problem was. Why he's harrassed [sic] me all the time. And he said there was nothing he could do. I was a probationary employee, he was allowed to do that.

On July 31, 1984 Montgomery was assigned to work in Department 3–A ("Blending") under Supervisor Jack Wright ("Wright"), a black. Montgomery requested a Gate Pass from Wright that day so he could leave the premises during lunch (Montgomery Dep. 109–10). His Gate Pass was time-stamped at the entrance to the plant when Montgomery left and when he returned (*id.* 73, 111). Later in the day the plant's entrance guard sent the Gate Pass to Ward, who in turn called Wright into his office to advise him Montgomery had returned from lunch two minutes late (Bechtol Dep. 31–32; Wright Dep. 84–86).

While Wright was in the office, Ward telephoned Barthel and told him Montgomery had overstayed his lunch that day and there was evidence of his having done so twice before, and Ward strongly recommended Montgomery be terminated (Barthel Dep. 31). Barthel said he "wholeheartedly agree[d]" and took steps to effectuate the termination (*id.*). He did not ask Ward about the "evidence" of prior tardiness because, having worked with Ward for six years, he knew Ward to be "very thorough in his investigation of employee relation type activities" and had "total confidence in his judgment" (*id.* 33). Barthel never saw any written documentation of Montgomery's tardiness (*id.* 37).

In carrying out the termination, Barthel followed his standard procedure of advising both the personnel manager and the employee's supervisor—in this case Neigh-

---

**7.** At no time, Koskan says, did he make written notes of Montgomery's tardiness until August 23, 1984. Then he prepared a memorandum recounting the three prior occasions he had counseled Montgomery (Koskan Dep. 71–72, Ex. 1).

bors—of his termination decision (*id.* 33–35). On August 1, 1984 Neighbors gave Montgomery his dismissal notice, initialed by Barthel (*id.* 35–37; Neighbors Dep. 88), which read (Barthel Dep. Ex. 1):

> Reason for Dismissal: Overstaying lunch or break period. Excessive (Rule # 40).

Montgomery alleges he was told by both Neighbors and Miller that Koskan "had sent down the order for me to be terminated" (Montgomery Dep. 112, 114, 163). On the contrary, Koskan says he not only had nothing to do with the decision to terminate Montgomery, but he did not even know of the termination until one week later (Koskan Dep. 67–69, 81–82). Moreover, one of the other black supervisors, Wright, socializes with Koskan from time to time and does not believe him to be a racist. Nor, says Wright, does Koskan have a reputation among blacks at Campbell as being a racist (Wright Dep. 96–97).

Following Montgomery's termination, Manager of Human Resources Lew Bechtol ("Bechtol") conducted his customary investigation of the circumstances surrounding the termination (Bechtol Dep. 33, 42). He spoke with Wright, Neighbors and Koskan and had Koskan prepare a written report concerning Montgomery's failure to return from breaks on time (*id.* 34, 37; Koskan Dep. Ex. 1). Eventually another black employee was hired to replace Montgomery (Bechtol Aff. ¶ 4). Indeed all seven new Campbell employees hired in August 1984 were black (*id.*).

Montgomery filed a grievance with the Union. On August 7, 1984 the Union requested Montgomery's reinstatement because the "Union feels the dismissal is unjust" (Montgomery Dep. Ex. 13). Montgomery also filed a May 29, 1985 Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging Campbell had "discriminated against him by harassing him with warnings and terminating him because of his race (Black)" (Montgomery Dep. Ex. 14). How-

ever, the EEOC concluded there was "not reasonable cause to believe that allegation to be true" (*id.*). Montgomery then filed this action August 27, 1985.

### Theories of the Parties

Montgomery does not assert Barthel or Ward terminated him because of his race, or even that they suspected Koskan had falsely accused Montgomery of tardiness because of his race. Montgomery's contention is rather that *Koskan,* because Montgomery is black, intentionally *caused* Barthel and Ward to terminate him by creating a record of tardiness on which they relied in making the termination decision.[8]

Campbell's current motion attacks that theory on three grounds:

> 1. Ward and Barthel (not Koskan) made the decision to terminate Montgomery. It is therefore irrelevant whether Koskan intended to discriminate on the basis of race, so long as Ward and Barthel did not.
> 2. Montgomery has not, in any event, met his burden of establishing a prima facie case of racial discrimination by Koskan.
> 3. No evidence suggests Campbell's articulated reason for terminating Montgomery is a pretext for racial discrimination.

This opinion addresses only the first two arguments, for they prove dispositive.

### Intent To Discriminate

Campbell Mem. 15–16 urges the intent and actions of Koskan, even if discriminatory, are irrelevant because Koskan had no role in the decision to terminate Montgomery. What Montgomery must show, Campbell maintains, is discriminatory intent on the part of the men who actually made the termination decision (Barthel and Ward) by showing they knew Montgomery's record was tainted by Koskan's unfair and racially-motivated reprimands for tardiness, yet

---

8. Although Montgomery testified Koskan actually sent down an order for him to be terminated, Montgomery Mem. 2 speaks only of the "causal effect" of Koskan's reports of Montgomery's tardiness.

relied on it anyway in making their decision.

■ If Campbell were correct in that assertion there would be no need to continue, for there is no evidence Ward or Barthel terminated Montgomery for any reason other than their good faith belief he had repeatedly violated Campbell's Rules. But that is oversimplistic: Under the case law Montgomery need not show the persons who actually made the termination decision had discriminatory intent *if* he is able to show another supervisor (Koskan) (1) had that intent and (2) as a result took actions that *caused* others within the company to terminate Montgomery.

■ As a preliminary matter, there is no question Campbell may be held liable for race discrimination if Koskan, a Campbell supervisor acting within the range of his decision-making authority, repeatedly accused Montgomery—because he is black—of failing to follow a company rule. *Hunter v. Allis-Chalmers Corp., Engine Div.*, 797 F.2d 1417, 1422 (7th Cir.1986) (citations omitted, emphasis in original) teaches:

> Since the acts of a corporation are acts of human beings, to say that the "corporation" has committed some wrong (rather than just that it is liable under the doctrine of respondeat superior for an employee's wrong) simply means that someone at the decision-making level in the corporate hierarchy has committed the wrong; the deliberate act of such a person is the corporation's deliberate act.... Whether *his* superiors know or should have known what he did is irrelevant; it becomes relevant only where the wrong is committed by someone below the managerial level.

Of course Montgomery does not challenge Koskan's allegedly racially-motivated false accusations directly. Had he done so, he might have argued his resulting termination was a harm flowing from those dis-

criminatory acts, entitling him to reinstatement and back pay. Instead Montgomery has elected to challenge the termination decision itself as discriminatory, on the ground it would not have been made *but for* Koskan's racially-motivated and fabricated accusations.

■ If Montgomery is correct in that assertion of causality (it is a disputed factual issue), then Koskan's discriminatory intent may indeed provide the basis for challenging the termination itself as discriminatory. Campbell has a system under which the evaluations and input of supervisors are requested and relied on in making termination decisions. Thus once Ward and Barthel considered Koskan's racially-motivated reports of tardiness as a necessary precondition for their decision to terminate Montgomery, the corporate decision became tainted by discrimination.[9] In the *Hunter* sense Koskan, whose recommendation is the known predicate for the ultimate firing decision (even though the higher-level employee who actually reaches that decision is not a mere rubber stamp), may fairly be labeled as "someone at the decision-making level in the corporate hierarchy [who] has committed the wrong" (797 F.2d at 1422). Hence "the deliberate act of [Koskan] is the corporation's deliberate act" (*id.*).

Campbell seeks to counter that by calling upon *LaMontagne v. American Convenience Products, Inc.*, 750 F.2d 1405, 1412 (7th Cir.1984) and *DeHorney v. Bank of America National Trust and Savings Association*, 39 Fair Empl.Prac.Cas. (BNA) 723, 732–33 (9th Cir.1985), *opinion withdrawn on other grounds*, 777 F.2d 441 (9th Cir.1986). Its reliance on those cases is misplaced. There the courts disregarded, as irrelevant, evidence of discriminatory intent precisely because the individuals involved (unlike Koskan) had no influence on the termination decisions. Accord, this

---

**9.** When Ward recommended Montgomery be terminated, he relied not only on the undisputed July 31, 1984 tardiness but also on "evidence" Montgomery had been late twice before. Although Ward did not explicitly say so, this Court assumes (most favorably to Montgomery) those other incidents of tardiness were reported by Koskan (there is no evidence any other Campbell supervisor ever reported Montgomery late).

Court's opinion in *Zick v. Verson Allsteel Press Co.*, 644 F.Supp. 906, 912 (N.D.Ill. 1986).

■ *Arna v. Northwestern University*, 640 F.Supp. 923 (N.D.Ill.1986), while at first glance similar to this case, does not support Campbell's position. In *Arna* the black plaintiff charged that a supervisor wrote negative, racially-motivated comments in plaintiff's file and thereby caused the employer to terminate him. Because the supervisor's allegedly discriminatory actions (unlike those of Koskan) had taken place long before the actual termination, a challenge of those actions was untimely. Had the court permitted plaintiff to assert, as Montgomery has, the later termination was discriminatory because caused by the earlier acts, it would have sanctioned an impermissible end run around the time bar. Accordingly the court held plaintiff had to show the termination decision was discriminatory because the person making that decision knew plaintiff's file was tainted, yet relied on it (*id.* at 927–28).[10]

Because Montgomery's challenge to Koskan's actions is timely, he is not foreclosed from showing his termination was discriminatory if caused by Koskan's racially-motivated and fabricated reports of Montgomery's tardiness. Consequently this Court must determine whether Montgomery has met his burden of establishing a prima facie case of racial discrimination by Koskan (and therefore Campbell).

*Analytical Framework*

Rule 56 permits a grant of summary judgment only:

if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Campbell must therefore show Montgomery has raised "no genuine issue as to any material fact" tending to show race discrimination. As *Backes v. Valspar Corp.*, 783 F.2d 77, 78–79 (7th Cir.1986) (citations omitted) put the test:

But at the summary judgment stage the burden of proof is on the moving party, in this case the defendant, to show that the outcome of a trial would be a foregone conclusion because with discovery complete the opposing party has turned up no evidence of an essential element of his case or defense.[11]

■ Title VII and Section 1981 have identical standards of employer liability (*Yarbrough v. Tower Oldsmobile, Inc.*, 789 F.2d 508, 511 (7th Cir.1986)). To prevail Montgomery must show he was intentionally terminated because of his race (*Yarbrough, id.* at 510–11; *Tulloss v. Near North Montessori School, Inc.*, 776 F.2d 150, 155 (7th Cir.1985)). *Tulloss, id.* (citations omitted) teaches that although the familiar *McDonnell Douglas* test is "an orderly and efficient way to evaluate evidence of employment discrimination":

[It] does not represent the only method by which a plaintiff may make out a claim of intentional discrimination nor was it "intended to be rigid, mechanized, or ritualistic" in application.... The ultimate question in any Title VII disparate treatment case is whether the action was founded in a discriminatory intent.

Montgomery need merely offer "evidence adequate to raise an inference that he was discharged on the basis of his race" to establish a prima facie case of intentional

---

10. Some language by Judge Moran in *Arna, id.* at 927 may be read as consistent with Campbell's position here. But in fairness to Judge Moran, he had available to him (and availed himself of) the alternative time-bar ground of disposition. Moreover, the same direct causal link that ties Koskan's action (and hence his intent) to Campbell's firing decision in this case was not wholly present in *Arna* (there the firing official was said to have "expressly relied *in part*

on Arna's 'previous offenses,' " *id.* (emphasis added)).

11. [Footnote by this Court] As Title VII and Section 1981 cases are governed by the general preponderance-of-the-evidence standard of proof, nothing in *Anderson,* 106 S.Ct. at 2514 modifies the *Backes* statement of operative principles.

discrimination (*Yarbrough,* 789 F.2d at 511).

### Inferential Evidence of Discrimination

█ Montgomery relies on the statements and actions of Koskan as creating both direct and indirect evidence of race discrimination. While evidence Montgomery was treated unfairly or harassed by Koskan may tend to prove he was treated differently from other employees, it does not tend to prove he was treated differently because of his *race.* On that score, Montgomery proffers a single Koskan statement as evidence of that critical element (Montgomery Dep. 81):

> [H]e said well, glad to have you back, but if you don't watch yourself, and watch your lunch and breaks, he said, I am going to get rid of all you old blacks that was here before, just as I got rid of your friend Mr. Spoon.

Montgomery, stressing that reference to getting rid of "all you old blacks," reads Koskan's statement as a warning he intended to cause Montgomery to be terminated because of his race. Campbell, on the other hand, emphasizes the qualifier ("if you don't watch yourself, and watch your lunch and breaks") to urge the statement was merely a friendly warning to Montgomery not to overstay his breaks as he had done in the past when working for Koskan.[12]

It is precisely because such a statement is susceptible to different interpretations that it is ordinarily left to the jury to determine its meaning. *Stumph v. Thomas & Skinner, Inc.,* 770 F.2d 93, 98 (7th Cir.1985) teaches even a single statement such as Koskan's may be enough to bar summary judgment. In *Stumph* defendant's president ("Cronk") allegedly told the 55–year–old plaintiff (*id.* at 94):

the Company was going to have to get rid of some of its older employees and get a young, aggressive organization in place for when the economy turned around.

Two months later Cronk told plaintiff his job was being eliminated because business was bad.

But there is a crucial difference between *Stumph* and this case: the context in which the allegedly discriminatory statements were made. In *Stumph* there was other evidence (though admittedly weak) that arguably tended to support plaintiff's theory of age-based discrimination—and there was nothing that flatly undercut the plausibility of such a motivation. Thus the court was compelled to conclude the evidence, though it might not prevail at trial, was still evidence, and the district court should not have weighed its probative value in a summary judgment motion.

By contrast, all the evidence in Montgomery's case points to the opposite conclusion: It completely scotches any theory of race-based discrimination. Only a brief review is needed to demonstrate that even apart from the circumstances in which the single assertedly-biased statement was made: [13]

1. Montgomery himself did not understand Koskan's statement to evince an intent to discriminate against Montgomery because he was black—at least not before he filed discrimination charges. When Montgomery allegedly complained to the Union Steward of Koskan's unfair treatment he indicated he did not know *why* Koskan was harassing him (Montgomery Dep. 99).

2. It is not surprising Montgomery did not initially label his race as the reason. During his deposition Montgomery said Koskan's treatment (good or bad) of an employee depended on wheth-

---

12. For this purpose Campbell must, in the summary judgment context, accept Montgomery's account of the conversation despite Koskan's total denial.

13. Although this is not of course an occasion to weigh evidence, and this Court does not, it is worth observing Montgomery's claimed quotation of Koskan follows hard on the heels of—in Montgomery's own terms—Koskan's greeting him, shaking his hand and uttering the allegedly discriminatory words while still holding Montgomery's hand.

er he liked the employee, and Koskan included both black and white employees among those he favored (*id.* 148). Relatedly, when Watson and Neighbors (both black) saw or heard (through Montgomery) of Koskan's alleged harassment they only smiled or laughed (*id.* 84–85, 87–88).

3. It borders on the frivolous to urge Koskan wanted to get rid of Montgomery because he is black (as opposed to some other reason), when Koskan knew Montgomery would in all likelihood be replaced by another black employee (as indeed he was). Koskan had been a Campbell supervisor for at least 10 years. Not only was the workforce he supervised approximately 85% black, but 179 (97.2%) of the 188 new employees hired between August 1982 and August 1984 (Montgomery was hired in June 1984) were black. All of the seven probationary employees hired during the month of August 1984 (when Montgomery's firing took place) were black.

■ Montgomery cannot survive summary judgment unless he produces evidence from which a trier of fact could *reasonably* infer race was a determining factor in his termination (*Parker v. Federal National Mortgage Association*, 741 F.2d 975, 980 (7th Cir.1984), affirming this Court's opinion, 567 F.Supp. 265, 267 (N.D.Ill.1983)). That is so because (*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, — U.S. ——, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citation omitted)):

> Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial."

After reviewing all the evidence, this Court concludes Montgomery—even with the benefit of all reasonable supporting inferences—has failed to meet his burden of creating the necessary reasonable inference of race discrimination. For while

there may arguably be factual disputes over whether:

1. Koskan falsely accused Montgomery of overstaying his breaks and

2. those false accusations were the but-for cause of Montgomery's termination,

there is *not* a genuine issue of material fact as to the *reason* Koskan acted. It is simply not reasonable to infer he did so because Montgomery is black. And if Koskan did treat Montgomery unfairly,[14] and if he did so for any reason other than the color of Montgomery's skin, that is wholly immaterial for purposes of this lawsuit. As a matter of law, this Court holds Campbell has not violated Title VII or Section 1981.

### Conclusion

There are no genuine issues of material fact, and Campbell is entitled to a judgment as a matter of law. This action is dismissed.

Montgomery arguendo assumption.

---

**14.** It should be emphasized no such factual finding is being made here. That is merely a pro-