Oscar L. **HEARN**, Plaintiff-Appellee,

v.

**R.R. DONNELLEY & SONS COMPANY,** Defendant-Appellant.

No. 83–2092.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 16, 1984.

Decided July 25, 1984.

Rehearing and Rehearing En Banc Denied Sept. 24, 1984.

William D. Snapp, Jenner & Block, Chicago, Ill., for plaintiff-appellee.

Michael G. Cleveland, Vedder, Price, Kaufman & Kammholz, Chicago, Ill., for defendant-appellant.

Before BAUER and CUDAHY, Circuit Judges, and BEATTY, District Judge.[*]

BAUER, Circuit Judge.

Defendant R.R. Donnelley & Sons Company (Donnelley) appeals from the district court's judgment in favor of Plaintiff Oscar Hearn. The court held that Donnelley violated Section 704(a) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–3(a) (1976), and 42 U.S.C. § 1981 (1976), by refusing to hire Hearn in retaliation for Hearn's civil rights activities when he was a Donnelley employee several years earlier. The court ordered Donnelley to hire Hearn and compensate him for lost wages, reasonable attorneys' fees and costs, and emotional distress.

Donnelley contends that the district court's finding is unsupported by the evidence, that the court applied an improper burden of proof at trial, and that the court erred in calculating Hearn's damages. Our examination of the record convinces us that the evidence does not support the district court's finding that Donnelley retaliated against Hearn. We conclude that the district court's finding is clearly erroneous, and thus we reverse.

## I

Donnelley is a large commercial printing company whose headquarters are located in Chicago. Donnelley first employed Hearn in 1955 as an unskilled worker at one of its principal printing facilities, the Chicago Manufacturing Division. Hearn worked there for six months, and then left to attend college, serve in the United States Marine Corps, and work in a variety of jobs. In 1963, Donnelley again hired Hearn as a laborer in the Chicago Manufacturing Division. Hearn began apprenticeship training in the company's rolltender program in 1965 and in 1967 was promoted to journeyman rolltender.

In 1968, Hearn, who is black, helped organize and lead a group of black Donnelley employees called "Unity." The group protested against Donnelley policies that they claimed discriminated against them, and led a work stoppage the day after Martin Luther King, Jr. was assassinated. After several meetings between Unity members and management personnel, Donnelley created an employee advisory group to review company policies and address employee grievances. At Unity's request, the company appointed Hearn to the group in May 1968. Hearn remained with the advisory group until January 1, 1969, when he was promoted to production planning foreman. On July 15, 1969, Hearn was promoted to line foreman.

On June 3, 1971, Hearn resigned to resume his college education. He earned a Bachelor of Arts degree in political science from Loyola University in Chicago and a Master of Arts degree in political science from the University of Michigan. On May 3, 1974, Hearn went to Donnelley's corporate headquarters to apply for a job. There he met Bill Sloan, a sales manager who knew Hearn, and Sloan introduced him to Ronald Slater, a personnel recruiter. Hearn told Slater that he was interested in the position of assistant manager of employee relations, but Slater informed him that Donnelley intended to fill that position internally. Slater encouraged Hearn to consider a position in sales. Slater testified at trial that he considered Hearn a good candidate for the sales program because of Hearn's personal qualifications and be-

[*] The Honorable William L. Beatty, Judge of the United States District Court for the Southern District of Illinois, is sitting by designation.

cause Donnelley was seeking minority sales representatives as part of its affirmative action program. Hearn urged Slater to contact several Donnelley executives who knew him from his earlier employment there. Over the next two or three weeks, Slater discussed Hearn's qualifications with these executives. Slater testified that they told him Hearn "could and should be considered for rehire." Tr. at 234. Slater also spoke to Hearn on the telephone two or three weeks after their interview. About two weeks after the interview, Slater completed an applicant evaluation form for Hearn on which Slater wrote: "No opening for which candidate could be considered. Unsure of what he wanted." Tr. at 235. On July 3, Slater filled out a second report on which he wrote: "App[licant] was not sure what he wanted." *Id.* Slater testified at trial that he completed the second form because he had misplaced the first form.

Hearn also met with Donnelley's corporate manager of personnel development, with whom he discussed positions as assistant manager and sales representative. He also saw John Dennis, director of the Chicago Manufacturing Division, who told Slater that there were no positions in the Chicago division because Donnelley had reduced the number of supervisors after *Look* and *Life* magazines had ceased publication. On May 10, Dennis sent a note to Slater's immediate superior that stated: "FYI. We do not have an opening in the Chicago Division." Plaintiff's Exhibit 99. On July 2, Hearn telephoned Gaylord Donnelley, Chairman of the company's Board of Directors, and complained that Dennis had refused to give him a supervisor's position. Gaylord Donnelley told Hearn that the company had no positions for him.

Later that month, Hearn filed a formal charge of employment discrimination against Donnelley with the Equal Employment Opportunity Commission. In May 1977, the EEOC rejected Hearn's claim. Hearn then sued Donnelley in district court for racial discrimination and retaliation. In April 1981, the district court found for Hearn on what the court termed "a fairly narrow ground." R. 117, Attachment A at

2. The court rejected Hearn's race discrimination claims, but found that Donnelley had retaliated illegally against Hearn by refusing to consider him for a sales position because of his prior involvement with Unity. Specifically, the court found that Slater received "signals" from the Chicago division, and that he "misread" these signals. The court said, "Mr. Slater believed that he was implicitly being told, and I think erroneously: We want to hire more blacks, but we don't want to hire this one— and that he acted accordingly." *Id.* at 9–10. The court found it "very difficult to believe" that a man with Hearn's experience and motivation "would not even be considered for the normal pattern of consideration for a sales job in the situation where the corporate division was actively seeking through affirmative action to increase its minority representation of sales personnel." *Id.* at 9. The court ordered Donnelley to hire Hearn in a sales reserve position, and to pay Hearn $198,750 in back pay, his costs and reasonable attorneys' fees, and $5,000 in compensation for emotional distress.

## II

Donnelley contends that the record does not support the district court's finding that it acted in retaliation when it refused to hire Hearn in a sales reserve position. Because Donnelley is challenging the trial court's factual conclusions, our review is limited to determining whether the court's findings are clearly erroneous. Fed.R. Civ.P. 52(a). We also recognize that courts often must rely on circumstantial evidence of employer motivation in employment discrimination cases. *See United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 1481 n. 3, 75 L.Ed.2d 403 (1983) (plaintiffs in Title VII cases not required to submit direct evidence of discriminatory intent).

The district court's holding rests on its finding that when the Donnelley executives told Slater that he "could and should" consider Hearn, Slater "misread signals" and concluded that he should not consider Hearn. Our examination of the record convinces us that the evidence does not sup-

port this finding. The court stressed that Hearn was a desirable candidate for a sales position. Although Slater testified that Hearn had many attractive qualities, see tr. at 225–27, Slater also articulated a legitimate, nondiscriminatory reason for not scheduling further interviews for Hearn. Slater testified, "[i]t was my opinion formed during the interview with Oscar [Hearn] that his primary interest was as manager of employee relations, and that he did not express an interest, certainly not a strong interest, in becoming a sales representative for R.R. Donnelley." Tr. at 234. Because Slater presented a legitimate reason for his decision, Hearn was required to show that Slater's proffered reason was a pretext for retaliation. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).

The district court discussed how the evidence supported a connection between Slater's decision to reject Hearn and Hearn's prior involvement with Unity as follows:

> It is clear from the evidence that Mr. Slater was aware of the Unity role that Mr. Hearn played earlier in the Chicago division in 1968 and thereafter. He was also aware that the Chicago division had said: We don't have a job for Mr. Hearn—despite his considerable prior experience with that division....
>
> When the Chicago division sent [Hearn] over to the corporate headquarters and said we can't use him, he was involved in various civil rights activities back here prior to his going off to school, [Slater thought] that they were, in effect, saying to Mr. Slater: And you don't want him either.

R. 117, Attachment A at 8–9. The record does not support this finding. First, the court confused the sequence of Hearn's interviews. The record shows that the Chicago division did not send Hearn to corporate headquarters; rather, Hearn first interviewed at the corporate offices and later visited the Chicago division. Second, the only message from the Chicago division regarding its decision not to hire Hearn was the May 10 note sent to Slater's superior. There is no evidence that this note

mentioned Hearn's former involvement in civil rights activities, nor is there evidence that Slater's boss received the note or that Slater saw it. The district court also specifically found that the Chicago division "was acting in good faith and for non-discriminatory reasons in telling Mr. Hearn that there just wasn't anything available." *Id.* at 7.

Finally, the record contains no evidence that Slater thought Hearn's involvement in Unity made him a less attractive candidate for a sales position. Slater stated that during the interview Hearn mentioned his previous disagreement with some of Donnelley's past policies and that Hearn then suggested that Slater contact several Donnelley executives. Although Slater testified that these executives mentioned Hearn's prior involvement with Unity, Slater also testified that the executives said that he "could and should" consider Hearn's application. Moreover, in a pretrial deposition, Slater said that "each [executive] stated that while Oscar [Hearn] had been in disagreement with RRD management and management policies, he was a capable individual and should be evaluated in accordance with our normal selection policies." Plaintiff's Exhibit 102. Indeed, Donnelley had never fired any former Unity member, and Hearn himself was promoted twice after 1968. In summary, the record is devoid of evidence, direct or circumstantial, that Slater received a message from the Chicago division that Hearn's application should not receive full consideration.

Donnelley offered a legitimate reason for not hiring Hearn, and the evidence that the district court cited fails to show that Donnelley's reason was merely pretextual. On appeal, Hearn has attempted to support the court's holding by arguing that several other factors show that Slater acted out of retaliation. First, Hearn argues that although Slater testified that he decided Hearn was not a viable candidate during their initial interview, Slater later asked several Donnelley executives about Hearn, and that because the executives all told Slater about Hearn's Unity involvement, this must have been a factor in Slater's

decision. This argument is based on pure speculation. Upon Hearn's urging, Slater contacted the executives to augment his evaluation. As discussed above, the record does not show that any of the executives with whom Slater spoke suggested that Hearn's prior civil rights activities precluded him from normal consideration for a sales position.

Second, Hearn contends that "suspicious circumstances" surrounded Slater's completion of his application evaluation form, because Slater filled out the form after he spoke with the Donnelley executives about Hearn instead of immediately after the interview. This argument is also based on conjecture. Slater's uncontradicted testimony was that a delay in completing applicant evaluation reports was not unusual.[1]

Third, Hearn argues that the subjective nature of Slater's "sincere interest in sales" criterion casts suspicion on Slater's decision. Although an employer might use subjective reasons for refusing to hire an applicant as subterfuge for discriminatory motives, subjective criteria also may furnish a legitimate basis for employment decisions. *See, e.g., Nellis v. Brown County*, 722 F.2d 853, 860 (7th Cir.1983). We decline to speculate about the motives that might have underlain an employer's subjective considerations when there is no discernible evidence of discrimination or retaliation. *See Mason v. Continental Illinois National Bank*, 704 F.2d 361, 367 (7th Cir.1983) (Cudahy, J., concurring). Hearn's argument would require us to engage in such speculation.[2]

### III

We conclude that the district court's finding that Donnelley acted in retaliation against Hearn is clearly erroneous. We thus need not address Donnelley's other objections. The district court's order is reversed and this case is remanded with instructions that judgment be entered for Donnelley.

REVERSED AND REMANDED WITH INSTRUCTIONS.

---

1. Hearn also insinuates that Slater's completion of a second evaluation form on the same day Hearn spoke with Gaylord Donnelley shows that Slater was attempting to "cover-up" some prior malfeasance. This argument is patently meritless. The second form contained essentially the same comments as the first form, and there is no evidence that Slater knew Hearn had talked to Gaylord Donnelley. Slater's explanation that he filled out a second form because he thought he misplaced the first form was uncontradicted at trial.

2. Hearn's other contentions are resolved by the discussion above and need not be addressed specifically.