**Oliver POLLARD, Jr., Plaintiff,**

v.

**REA MAGNET WIRE COMPANY, INC., Defendant.**

**Civ. No. F 86–44.**

United States District Court, N.D. Indiana, Fort Wayne Division.

Oct. 24, 1986.

Steven L. Jackson, John H. Krueckeberg, Krueckeberg & Smith, P.C., Fort Wayne, Ind., for plaintiff.

Matthew Connelly, Blume, Wyneken, Connelly & Stucky, Fort Wayne, Ind., Linda M. Fratto and Marlene W. Jackson, Pittsburgh, Pa., for defendant.

## MEMORANDUM DECISION AND ORDER

WILLIAM C. LEE, District Judge.

This matter is before the court for a decision on the merits following a bench trial. The court heard testimony on September 29–30, 1986 and final arguments on October 1, 1986. The court enters the following Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52(a), after having examined the entire record and having determined the credibility of witnesses; after viewing their demeanor and considering their interests.

### FINDINGS OF FACT

Oliver Pollard, Jr. is a black male. He was born December 9, 1955. He was hired by Rea Magnet Wire Company, Inc. (Rea) on November 8, 1978 as an hourly employee. Pollard was qualified for his job and performed his work satisfactorily. Pollard worked at Rea until August 21, 1984, when he was terminated.

Rea is a corporation licensed and authorized to do business in Indiana. Each hourly employee of Rea was a member of Local 863 of the International Union of Electronic, Electrical, Technical, Salaried and Machine Workers, AFL–CIO. Rea negotiated a collective bargaining agreement with Local 863 which was in full force and effect from April 15, 1983 through April 15, 1986.

The collective bargaining agreement contained a provision relating to termination of seniority.

All seniority and employment of an employee shall terminate if any of the following occur during the term of this agreement:

... F. The employee is absent for a continuous period including five (5) scheduled work days without permission unless it was not reasonably possible for the employee to request such permission of the company....

This provision is identical to the provision contained in previous collective bargaining agreements dating back to 1977.

In 1982 Rea instituted an attendance policy to curb absenteeism. Under the policy each employee was given six (6) positive points. An additional three (3) points were added each month an employee worked with no tardiness or absence. Two (2) points were deducted for each instance of tardiness or leaving early and six (6) points were deducted for each absence, and for other failures. The discipline system is as follows:

Six (6) negative points equals a verbal warning.

Twelve (12) negative points equals a written warning.

Eighteen (18) negative points equals a three (3) day suspension.

Twenty-four (24) negative points equals a five (5) day suspension.

Thirty (30) negative points equals termination.

The policy defines an absence as:

An instance of an absence is any full scheduled shift including overtime if scheduled or accepted. Consecutive shifts of absence, however, is considered one instance. (1) If an employee is absent Tuesday, Wednesday, Thursday, Friday, and Monday (no Saturday or Sunday work scheduled), that is, six (6) points total.

The attendance policy, by its own language, clearly contemplates absences of five (5) days.

Oliver Pollard did not report to work the week of July 23, 1984. On the morning of July 23, 1984, Pollard called Rea and spoke to Foreman John Young. Pollard told Young that he would not be in for "personal reasons" and that he had an injured ankle. Pollard also called in on Tuesday and told Merlin Feasby that he would not be in, but did not mention his ankle. Pollard called in on Wednesday and told Kim Everson that he would not be in, but did not mention his ankle. Pollard called in again on Thursday and talked to Feasby again and told him he would not be in and

did not mention his ankle. Pollard's sister called in for him on Friday, July 27, 1984. Rea's foreman did not indicate to Pollard that he needed an additional excuse or justification for being off.

When Pollard's sister called in on Friday she was told to tell Oliver to contact Personnel Manager Susan Vachon before reporting to work on Monday, July 30, 1984. Pollard and his union representative met with Vachon on Monday, July 30, 1984. When Vachon asked Pollard why he had been absent Pollard said that he was out during the week with an ankle injury. Prior to the July 30, 1984 meeting, Vachon had not been told of Pollard's ankle injury. No one told Pollard to get a medical excuse. Pollard was then placed on suspension without pay pending an investigation.

Pollard is a body builder. In July of 1983 Pollard was granted leave to compete, as Mr. Fort Wayne, in an out of state body building competition. In June of 1984, Pollard requested a leave of absence for the week of July 23, 1984, so that he could take care of some personal business.[1] Vachon denied Pollard's request for a leave of absence.

Vachon did not believe that Pollard's ankle was injured. Vachon believed that Pollard took the week of July 23, 1984 off to attend the body building event. She conducted the investigation to determine whether Pollard had gone to the out of state event. Vachon contacted airlines to see if Pollard had booked any out of town flights. She also contacted a Las Vegas tourism bureau and asked about weight lifting or body building shows. The investigation was fruitless.

Pollard was ostensibly fired for violating Article 9, § 4(F) of the collective bargaining agreement, for being absent for a continuous period including five (5) scheduled work days without permission. Under this provision, Pollard could have been terminated during the Monday, July 30, 1984 meeting. No satisfactory reason was giv-

---

1. There is some dispute as to whether the leave was for the entire week and whether it was requested so that Pollard could attend to personal business or attend a body building event.

After assessing the demeanor and testimony of various witnesses, the court concludes that Pollard only requested a two to three day period to take care of personal business.

en for placing Pollard on suspension when he could have been fired on July 30, 1984. Pollard would not have been fired if he had brought in a medical excuse. Vachon never told Pollard that he needed an excuse or that his job could be saved by bringing one in.

Pollard had been treated at Rea for ankle problems prior to July 23, 1984. He saw a company doctor on July 13, 1981, who diagnosed Pollard as having osteochondritis dissecans, a loose piece of cartilage, in his right ankle. On July 16, 1981, Rea's doctor diagnosed a bruised hematoma of the right ankle and ordered daily whirlpools. In August of 1981, Pollard was given light duty for thirty (30) days because of a ligament injury to his right ankle and the company nurse indicated that he needed a brace. Pollard reinjured his ankle on July 8, 1984, when he jumped out of the bed of a pick-up truck. He went to Rea's dispensary on July 9, 1984, where he was seen for injury to his ankle.

Pollard was at home during the week of July 23, 1984, with the ankle injury he had sustained on July 22, 1984. On July 22, 1984, Pollard was carrying four bags of groceries up the stairs to his house when his ankle "gave out" again. The management at Rea did not believe that Pollard had an ankle injury.[2]

The management of Rea did not believe Pollard because of an earlier incident involving a back injury, and because Pollard's injury coincided with his requested leave, which was denied. In early 1983, Pollard was off work with a back injury. Steve Cadwallder saw Pollard at a health spa lifting weights while he was off work. Cadwallder concluded that Pollard had not really hurt his back. Personnel Manager Al Hyman also knew that Pollard had been lifting weights while off with the injury. It is clear that Pollard's back was actually injured while he was off work in 1983.[3]

On August 8 and September 14, 1984, IUE Local 863 filed grievances on Pollard's behalf for his suspension and termination. Both grievances were filed beyond the five (5) working day limit and were denied as untimely. As a result of its untimeliness, Local 863 paid Pollard $2,000.00 to settle Pollard's claim against the union for lack of representation.

After his discharge, Pollard filed a claim for unemployment compensation with the Employment Security Division of Indiana. The Division ruled that Pollard's discharge was not for just cause. The referee concluded that the record failed to establish that Rea had published any procedures for obtaining permission to be off work. The referee also noted that Rea had been contacted each of the five days Pollard was absent.

Donald Dame and Thomas Gomez are former employees of Rea Magnet. Both Dame and Gomez were fired pursuant to Article 9, § 4(F). However, neither Dame nor Gomez can be compared with Pollard. Dame's reason for missing work was patently false. Dame was absent from work on May 7, 8, 9 and 11 and May 14 through 18. While he claimed to have been without transportation, he had purchased a new car on May 16, which he was driving on May 18.[4] Dame was fired because his reason for being off work was patently false.

(Like Dame, Gomez was lying). While Gomez claimed to be home sick, Al Hyman heard that Gomez was a "missing person" while listening to his police monitor. Unlike Pollard, Gomez was absent six (6) days and only called in twice to report his absence. While he was supposed to be home

---

**2.** After assessing Pollard's demeanor, the evidence relating to his previous ankle injuries, and the complete lack of any evidence to the contrary, this court accepts Pollard's testimony as true, and concludes that Pollard was off for an ankle injury.

**3.** Pollard's injury and illness record makes it clear that his back was injured while he was off work. Rea did not challenge the veracity of Pollard's claim that he was injured. Rea only challenged Pollard's receipt of workmen's compensation for the entire time that he was off, because he had failed to follow the doctor's prescribed treatment. Pollard was suspended for three days for failing to follow the treatment.

**4.** In response to a grievance relating to Dame's termination, Vachon concluded that Dame's "negligence" (his obvious lying) was without excuse.

sick, he went to the credit union to get some extra money for groceries. Unlike Pollard, neither Dame nor Gomez were put on suspension pending investigation. Both Dame and Gomez received notice of their termination by certified mail from Vachon, without being placed on suspension. Pollard was on suspension pending the investigation from July 30, 1984 through August 21, 1984, when he finally was notified of his termination.

There is nothing in Rea's written policies defining the term "without permission," as it is used in the collective bargaining agreement. Rea's written policies do not indicate that the absentee policy superseded, suspended or abrogated the collective bargaining agreement. From 1982 to 1985, Rea terminated employees under the absenteeism policy; however, no employee had absences of five (5) consecutive days. Pollard had been disciplined under the absenteeism policy prior to his discharge and at the time of his discharge had nine (9) negative points. Had Pollard been disciplined under the absenteeism policy, he would have received another six (6) negative points, giving him total of fifteen (15) negative points.

Pollard's total wage loss from July 30, 1984 through December 31, 1985 amounted to $24,507.60. Pollard received other wages in 1985 totalling $4,234.52. He also received $2,000.00 from the union in settlement for his claim of inadequate representation. Pollard's 1984 wages from other sources totalled $2,000.00, giving a total deduction of $8,234.52, making his entire claim for wages $16,273.08.[5]

It was humiliating for Pollard to tell his children that he had been fired. He was unable to buy Christmas or birthday presents for his children. As a result of his termination, his utilities were cut off and his ex-wife threatened him with contempt citations for non-payment of child support. Pollard was sued by Rea's credit union, Lincoln National Bank, and Fort Wayne Federal Credit Union, for failing to make loan payments. The Pollards' gas was cut off and they had to borrow a kerosene heater to heat their home. After his discharge, Oliver Pollard experienced a dramatic behavioral change; he became moody and was very unhappy. His children had to go to his parents' house to take showers.

## CONCLUSIONS OF LAW

■ This court has jurisdiction over the subject matter of this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and under § 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981. The court has jurisdiction over the parties. Defendant Rea is an employer within the meaning of Title VII.

This is a claim for employment discrimination on the basis of race. There are no issues regarding the timeliness of plaintiff's complaint or plaintiff's compliance with administrative procedures prior to filing the complaint. Pollard is a black male. This is a disparate treatment case. Pollard claims that his discharge was racially motivated.

Pollard has the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff[.]" *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). The framework of analysis of Title VII claims is well established.

First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the

---

5. Defendant agreed that plaintiff's wage loss calculation was accurate with the exception of a claim for fringe benefits in the amount of $2,450.76 and the 1984 wages. The plaintiff agreed to omit the fringe benefit figure. After hearing the testimony assessing the credibility of the witnesses, the court agrees with the defendant that the 1984 wages made by plaintiff should be increased from $1,500.00 to $2,000.00, reflecting a total deduction of $8,234.52.

evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. *Burdine,* 450 U.S. at 252–53, 101 S.Ct. at 1093 (quoting *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973)). *Accord United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983).

The plaintiff's burden at the prima facie phase of analysis is to prove the relative objective qualification of the job at issue. *Yarbrough v. Tower Oldsmobile, Inc.,* 789 F.2d 508 (7th Cir.1986); *Jayasinghe v. Bethlehem Steel Corp.,* 760 F.2d 132, 135 (7th Cir.1985). "By removing subjective job requirements from the prima facie phase of analysis, the plaintiff may create a rebuttable presumption of discrimination without direct proof of subjective intent." *Id.* In the second phase of analysis, the defendant is given the opportunity to articulate some legitimate, non-discriminatory reason for its employment action. "The legitimate purpose of this evidence is to 'allow the trier of fact rationally to conclude that the employment decision [was not] motivated by a discriminatory animus.'" *Coates v. Johnson & Johnson,* 756 F.2d 524, 531 (7th Cir.1985) (quoting *Burdine,* 450 U.S. at 257, 101 S.Ct. at 1096). *See also Nellis v. Brown County,* 722 F.2d 853, 857–58 (7th Cir.1983). The third phase of analysis, if reached, requires that the plaintiff attempt to persuade the court that the defendant's explanation is "unworthy of credence" or that "a discriminatory reason more likely motivated" the defendant. *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095. The plaintiff always retains the ultimate burden of persuasion. *Id.*

"[C]ourts often must rely on circumstantial evidence of employer motivation in employment discrimination cases." *Hearn v. R.R. Donnelley & Sons Co.,* 739 F.2d 304, 306 (7th Cir.1984), *cert. denied,* 469 U.S. 1223, 105 S.Ct. 1214, 84 L.Ed.2d 356 (1985). A district court cannot require a plaintiff to submit direct evidence of discriminatory intent. *Aikens,* 460 U.S. at 714 n. 3, 103 S.Ct. at 1481 n. 3 (quoting *International*

*Brotherhood of Teamsters v. United States,* 431 U.S. 324, 358 n. 44, 97 S.Ct. 1843, 1866 n. 44, 52 L.Ed.2d 396 (1977)). *See also Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095. ("The plaintiff retains the burden of persuasion. [H]e may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."). The question to be decided in a Title VII case is the "ultimate question of discrimination *vel non.*" *Aikens,* 460 U.S. at 714, 103 S.Ct. at 1481. "The factual inquiry in a Title VII case is whether the defendant intentionally discriminated against the plaintiff.... The district court must decide which party's explanation of the employer's motivation it believes." *Aikens,* 460 U.S. at 715–16, 103 S.Ct. at 1482. When the district court has heard and received all of the evidence in a case, it need not determine whether the plaintiff has actually made out a prima facie case, but may proceed to engage in this factual inquiry into the ultimate question of discrimination. *Id.* at 714–15, 103 S.Ct. at 1481–82; *Suson v. Zenith Radio Corp.,* 763 F.2d 304 (7th Cir. 1985).

When § 1981 is used as a parallel basis for relief with Title VII, its elements are identical to Title VII. *Lincoln v. Board of Regents of University System,* 697 F.2d 928, 935 (11th Cir.1983), *cert. denied,* 464 U.S. 826, 104 S.Ct. 97, 78 L.Ed.2d 102 (1983); *Pinkard v. Pullman Standard,* 678 F.2d 1211, 1224 (5th Cir.1982), *cert. denied,* 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 954 (1983); *Flowers v. Crouch Walker,* 552 F.2d 1277 (7th Cir.1977); *Waters v. Wisconsin Steel Works of International Harvester Co.,* 502 F.2d 1309, 1316 (7th Cir.1974), *cert. denied,* 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976).

An employer's arbitrary, ridiculous and irrational rules do not form the basis of relief unless applied discriminatorily. *Smith v. Monsanto Chemical Co.,* 770 F.2d 719 (8th Cir.1985), *cert. denied,* 475 U.S. 1050, 106 S.Ct. 1273, 89 L.Ed.2d 581 (1986). An employer may terminate an em-

ployee "for a good reason or a bad reason so long as a discriminatory or illegitimate motive is not involved." *Epps v. Continental Can Co.*, 22 Empl.Prac.Sec. (CCH) ¶ 30683 (M.D.N.C.), *aff'd without opinion*, 661 F.2d 920, 25 Empl.Prac.Sec. (CCH) ¶ 31798 (4th Cir.1981), *cert. denied*, 454 U.S. 900, 102 S.Ct. 404, 70 L.Ed.2d 217 (1981). When reviewing a discrimination claim a court must determine whether an employer's policies were applied in a discriminatory manner and not whether they were reasonable. *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir.1984).

## I.

### The Prima Facie Case

In the Seventh Circuit a prima facie case, in a wrongful termination case, is established by evidence that the general quality of an employee's work is satisfactory. *Yarbrough v. Tower Oldsmobile, Inc.*, 789 F.2d 508, 512 (7th Cir.1986). There is no question that Pollard's work was satisfactory. His records indicate that his work was satisfactory. As a body builder Pollard was particularly well qualified for some of the work he performed. Bruce Reinders testified that while he worked with Pollard at Rea they had to pull pallets (loaded with wire) with a hand jack for distances of fifty feet. There was virtually no evidence suggesting that Pollard was unqualified or that his work was unsatisfactory.

Pollard established a prima facie case of discrimination. Proof of a prima facie case entitles plaintiff to an inference of discrimination; it is not a factual finding to that effect. *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). The burden now shifts to Rea to articulate a legitimate, nondiscriminatory reason for discharging Pollard.

## II.

### Rea's Rebuttal

Rea offered a legitimate, nondiscriminatory reason for discharging Pollard. Rea claims that Pollard violated the collective bargaining agreement by missing five work days without permission. The court now turns to the central issue in this case; whether Rea's explanation for discharging Pollard is pretextual or not worthy of credence. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095; *Suson*, 763 F.2d at 308. The evidence shows that Rea's explanation is pretextual and not worthy of credence.

Rea introduced evidence showing that Rea had terminated two other employees pursuant to the same provision of the collective bargaining agreement that Pollard was terminated under to support its explanation. Donald Dame had missed nine days of work, claiming to be without transportation. Thomas Gomez missed six days of work, claiming to be home sick. While Pollard was ostensibly terminated for missing five days of work, neither the termination of Dame nor Gomez can be compared to Pollard's.

The evidence clearly showed that both Dame and Gomez had given patently false reasons for missing work. While Dame claimed to be without transportation he was seen driving a new car which he had purchased while he was off work. Gomez was also lying. While he claimed to be home sick Gomez was actually out and around. Pollard's reason for missing work, however, was true. He was home with an injured ankle.

The Dame and Gomez discharges are distinguishable from Pollard's in another respect. Vachon, who was responsible for Pollard's termination, did not discharge Pollard immediately after he had missed five days of work. Rather, she put Pollard on suspension pending an "investigation." During Pollard's suspension Vachon contacted airlines and a tourism bureau to find out whether Pollard had attended an out of town body building show. Vachon testified that she did not believe that Pollard was at home with an injured ankle. The evidence shows that Pollard's reason for being absent was true, despite Vachon's belief to the contrary. In a nutshell, both Dame and Gomez were caught red-handed; Pollard was not. The investigation was con-

ducted so that Vachon could prove that Pollard, like Dame and Gomez, was lying. When the investigation turned up nothing Pollard was fired anyway, even though unlike Dame and Gomez, Pollard was off for a legitimate reason.

If the real reason for firing Pollard was that he had violated the collective bargaining agreement he could (and should) have been fired on Monday, July 30, 1984, during his meeting with Vachon. No satisfactory reason was offered by Rea for not firing Pollard on that date. Dame and Gomez were fired for lying. Pollard was put on suspension so that it could be shown that he too was lying. He was not lying but was fired anyway.

There is other evidence to show that Rea's explanation is pretextual or not worthy of credence. The evidence showed that Pollard had an established record of discipline under the attendance policy. At the time of his discharge Pollard had nine (9) negative points. He would have received six (6) negative points for his absence, which equals a written warning (hardly discharge). As Rea correctly points out it can terminate an employee arbitrarily, so long as it does so without discriminating. *Smith,* 770 F.2d at 719. While not direct evidence of discrimination Rea's choice to discharge Pollard under the collective bargaining agreement, rather than to discipline Pollard under the absenteeism policy, is further evidence that Rea's explanation is not worthy of credence.

Lastly, the provision of the collective bargaining agreement Pollard was fired under allows Rea to terminate an employee who is absent for five continuous days "without permission." On July 23, 24, 25, and 26, 1984, Oliver Pollard called in and told Rea that he would not be in. On Monday, July 23, 1984, Pollard not only reported that he would not be in, but told Foreman John Young that he had an ankle injury. Pollard's sister called in for him on Friday, July 27. While Rea claims that Pollard missed five days "without permission," the evidence shows that Rea has no written procedures for obtaining "permission" and no written policies defining "without permission." For that reason, the Referee of the Employment Security Division of Indiana ruled that Pollard's discharge was not for just cause. The Division's ruling and the evidence presented at trial further show pretext. If Pollard's termination was actually for missing five days "without permission" then Rea should be able to answer the question: what does "without permission" mean? [6]

When a defendant articulates, as Rea has, a legitimate, nondiscriminatory reason for its actions the factual inquiry proceeds to a new level of specificity and the plaintiff must persuade the court that the defendant's explanation is "unworthy of credence" or that "a discriminatory reason more likely motivated" the defendant. *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095. Plaintiff retains the ultimate burden of persuasion. *Coates v. Johnson & Johnson,* 756 F.2d 524, 531 (7th Cir.1985). The court is persuaded, for the reasons articulated in "Rea's Rebuttal" that plaintiff has carried the burden of persuasion. Defendant's explanation is simply unbelievable. It is more likely that Rea was motivated by discriminatory reasons than the provision in its collective bargaining agreement.

### EVIDENTIARY MATTERS

During the course of trial the court promised to give further attention to a number of evidentiary rulings. The court admitted the findings of the Indiana Employment Security Division. The court conditionally admitted Bruce Reinder's testi-

---

**6.** The evidence shows that Rea has no written documents defining the phrase "without permission." Vachon testified that Pollard would not have been fired if he had presented a medical excuse. There are no written policies to that effect. Furthermore, Vachon never told Pollard that he could have saved his job by presenting a medical excuse. If "without permission" means without medical excuse, and if Pollard was fired for not having an excuse, someone should have told Pollard that he could have saved his job by getting a doctor to substantiate his injury. He could have done this during the "investigation." While Rea's ambiguous collective bargaining agreement has severe consequences, its ambiguity is not per se evidence of discrimination. *Smith,* 770 F.2d at 719. It is, however, evidence of pretext.

mony as to Susan Vachon's reputation among workers at Rea. The court also conditionally admitted Duval Bailey's testimony regarding the cases of Sim Nelson and Curly Johnson (to show that Vachon had a history of disparate treatment against blacks) and Bailey's testimony that Vachon is prejudiced towards blacks generally and black males specifically. Upon further consideration, the court now holds that among those things mentioned, only the findings of the Indiana Employment Security Division are admissible; the other evidence is not admissible and therefore has not been considered in this court's decision.

Defendant objected to the findings of the Indiana Employment Security Division on the grounds that it is hearsay and is irrelevant.[7] Defendant points out that the issue before the Division was whether Pollard's termination was for "just cause" and not whether Rea discriminated against Pollard. *See* e.g. I.C. 22–4–15–1 (just cause includes knowing violation of uniformly enforced rule). Generally, the admission of administrative agency findings rests within the sound discretion of the trial judge. *Johnson v. Yellow Freight System, Inc.*, 734 F.2d 1304, 1309 (8th Cir.1984). If the document is trustworthy within the meaning of Fed.R. of Evid. 803(8)(*c*), does not impair the judge's duty to try the case *de novo*, and is more useful than prejudicial, then it may be admitted. *Tulloss v. Near North Montessori School*, 776 F.2d 150, 152 (7th Cir.1985). Plaintiff offered the findings (two pages) to show that defendant's explanation was pretextual, that Rea had fired Pollard for being off "without permission," but had nothing defining "without permission." Pretext is at the heart of this case. The findings are clearly relevant, are not prejudicial, and were properly admitted.

Bruce Reinder's testimony that Vachon had a reputation among workers at Rea for being prejudiced against blacks is not admissible. Plaintiff argues that the testimony is admissible under Fed.R. of Evid.

404(a)(1) and 405. Rule 404(a)(1) is not relevant. That rule only applies to the character of the accused in a criminal case. Rule 405 also misses the mark, as it only allows testimony as to reputation when character evidence is otherwise admissible. Under Rule 608(a), reputation testimony is admissible to attack the credibility of a witness if the testimony refers only to character for truthfulness after the character of a witness has been attacked by reputation evidence. Reinder's testimony was both vague and scant; "Vachon's reputation preceded her." Even if it qualified under Rule 608, it fails to meet the test of Rule 403. Since Reinder's testimony has so little probative value, it is inadmissible and will not be considered in this decision.

Duval Bailey, Chief Investigator of the Fort Wayne Metropolitan Human Relations Commission (FWMHRC) was (conditionally) allowed to testify that in two prior cases (Sim Nelson and Curly Johnson), he had found probable cause against the Fort Wayne Public Transportation Company, while Vachon was employed in a personnel position. Defendant argues that testimony regarding these prior cases is hearsay (not within Rule 803(8)(*c*)), that the testimony is not relevant to prove character under Rule 404, and that the testimony should be excluded under Rule 403. Bailey's testimony is not hearsay. Bailey's testimony as to the Sims and Nelson cases was not offered to prove the truth of the matters asserted, but to show Vachon's racial attitudes. *See* e.g. *Hunter v. Allis–Chalmers Corp., Engine Div.*, 797 F.2d 1417, 1423 (7th Cir. 1986). Rule 404(b) is not relevant. That rule refers to bad acts of a defendant, *Hunter*, 797 F.2d at 1424, and precludes evidence of a defendant's bad acts to show that he acted in conformity therewith. Vachon was not employed by Rea during the pendency of the Sims and Johnson cases. Even if Rule 404(b) applied, it would not bar the testimony, which is admissible under the rule to prove "motive, opportunity, intent...." While the testimony is not

---

**7.** Originally defendant was also contending that the document was not authentic. This objection was withdrawn during trial.

barred under Rule 404 or as hearsay, it cannot pass the test of Rule 403. Bailey's probable cause determination as to Johnson was not upheld by the hearing officer. Bailey's probable cause determination as to Nelson was also reversed by the hearing officer, although the hearing officer's finding of no probable cause was itself reversed by the FWMHRC, which was ultimately held arbitrary and capricious by the Allen Circuit Court, as to Nelson's termination. The rocky road of the Nelson case puts the significance of Bailey's probable cause recommendation in serious doubt. While it may be relevant, Bailey's testimony as to Nelson and Johnson is without much probative value and will be excluded under Rule 403 and is not entitled to consideration by this court in its determination.

There is one last evidentiary issue. Bailey was conditionally allowed to testify that in his opinion Vachon is prejudiced against black males. Vachon's racial attitudes are obviously relevant. The Federal Rules of Evidence allow opinion testimony if it is based on perception and helpful to the determination of a fact in issue. Fed.R.Evid. 701. Bailey's "opinion," as cross-examination revealed, was based only on his "gut feeling." [8] Since Bailey's opinion was not rationally based on his perception it is not admissible under Rule 701. Bailey's opinions therefore are not entitled to consideration by this court.

## REMEDIES

### I.

#### Back Pay and Pollard's Duty to Mitigate Damages

 Having determined liability in the plaintiff's favor, the court now turns to the question of appropriate monetary relief.

Pollard seeks lost wages, compensatory damages for emotional distress, as well as costs and attorney fees. Lost wages are recoverable under both theories on which Pollard prevailed. *See Albemarle Paper Co. v. Moody,* 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975) (Title VII); *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 460, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295 (1975) (§ 1981); *Perry v. Hartz Mountain Corp.,* 537 F.Supp. 1387, 1389 (S.D.Ind.1982) (wrongful discharge). The liability established by plaintiff entitles him to an award of back pay. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Hunter,* 797 F.2d at 1425. Defendant agrees that plaintiff's total wage loss, as calculated in the "Plaintiff's Title VII Damage Calculation," is $24,507.60.[9]

Congress, however, has provided that "interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable." 42 U.S.C. § 2000e–5(g). After the employee establishes the amount of damages he seeks in lost wages, the employer has the burden of proving that he failed to mitigate those damages, in order to have the award reduced. *Hanna v. American Motors Corp.,* 724 F.2d 1300, 1307 (7th Cir.1984). To meet this burden, the employer must show that: (a) the plaintiff failed to exercise reasonable diligence to mitigate his damages, and (2) there was a reasonable likelihood that plaintiff would have found comparable work by exercising reasonable diligence. *Syvock v. Milwaukee Boiler Mfg. Co.,* 665 F.2d 149, 159 (7th Cir.1981). Pollard's wage claim must be reduced by $8,234.52 in order to mitigate his damages.[10] Thus, Pollard is entitled to $16,273.08 for back pay.

---

**8.** Bailey distinguished his "opinion" from his "professional conclusion." His "professional conclusion" was based on the Nelson, Johnson, and Pollard cases. His opinion was based on his "gut feeling."

**9.** Defendant objected to the inclusion of $2,450.76 in fringe benefits which the plaintiff agreed to omit and which the court's figure omits.

**10.** The "Plaintiff's Title VII Damage Calculation" included deductions totaling $7,734.52 for 1985 wages ($4,234.52), a settlement with the union ($2,000.00) and 1984 wages ($1,500.00). Defendant contends that Pollard's 1984 wages totalled $2,000.00 rather than $1,500.00. A fair estimate of plaintiff's income from the end of September 1984 until 1985 can be obtained from the plaintiff's income in early 1985. The

## II.

### Compensatory Damages for Emotional Distress

Compensatory damages for humiliation and emotional distress suffered by an employee subject to illegal discrimination are recoverable. *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975). *See also Ramsey v. American Air Filter Co., Inc.*, 772 F.2d 1303, 1313 (7th Cir.1985), and cases cited therein. Pollard suffered humiliation and emotional distress as a result of his termination. The evidence shows that it was humiliating for him to tell his children that he had been fired. His utilities were cut off and the Pollards had to borrow a kerosene heater to heat their home. He was unable to buy Christmas or birthday presents for his children. His children had to go to his parents' house to take showers. His behavior changed and he became moody and was very unhappy. There was no evidence of any out of pocket expenses resulting from these circumstances. The court determines that plaintiff is entitled to a $5,000.00 award of compensatory damages.

## III.

### Prejudgment Interest

Interest on wages that are due and owing is an available remedy to a plaintiff in a Title VII case, and can be awarded in the discretion of the trial court. *Hunter*, 797 F.2d at 1425–27; *Taylor v. Phillips Industries, Inc.*, 593 F.2d 783, 787 (7th Cir.1979). Such an award makes the plaintiff whole by reimbursing him for the lost use of the money to which he was entitled. The court finds that an award of prejudgment interest is justified in this case.

There have been a wide variety of methods employed in determining the rate of prejudgment interest for Title VII cases.

See *EEOC v. Wooster Brush Co. Employees Relief Association*, 727 F.2d 566, 579 (6th Cir.1984), and cases cited therein. This court follows the methodology set forth in *Dependahl v. Falstaff Brewing Co.*, 653 F.2d 1208 (8th Cir.), *cert. denied*, 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981). That case, involving a violation of the ERISA statute, held that the rate of prejudgment interest is a question of federal law when the cause of action arises from a federal statute, *id.* at 1218, and found that the federal statute for postjudgment interest, 28 U.S.C. § 1961, was the most appropriate statute from which to calculate the rate of prejudgment interest. That statute computes the rate of interest as the

> rate equal to coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of fifty two week United States Treasury bills settled immediately prior to the date of the judgment.

That rate is currently 5.75%, and thus Pollard will be awarded prejudgment interest at that rate. Given the amount of back wages due, the court finds the total amount of prejudgment interest to be $2,391.02.[11]

## IV.

### Attorney Fees

Pollard is also entitled to his reasonable attorney's fees, 42 U.S.C. § 2000e–5(k); 42 U.S.C. § 1988, and his reasonable costs. 28 U.S.C. § 1920. The considerations relevant to computing a reasonable attorney's fee award have been set forth by the United States Court of Appeals for the Seventh Circuit in *Waters v. Wisconsin Steel Works*, 502 F.2d 1309 (7th Cir.1974), *cert. denied*, 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976). Pollard has not submitted a request for fees detailing the

---

plaintiff's 1984 wages, from this estimate, must be increased by $500.00, reflecting the total deduction of $8,234.52.

**11.** This amount represents the interest accrued through monthly compounding of the interest generated by the amount of wages due. The court calculated the monthly balance of wages due beginning July 30, 1984 until December 31, 1985, and computed the interest due at the end of each month, adding that interest to the monthly balance due. The $2,391.02 figure represents the sum of the interest amounts so generated.

**656**

amount his attorney seeks under these provisions, and thus the court cannot enter an order setting forth the amount of the award. Plaintiff will be ordered to submit a motion to the court within twenty (20) days from the date of this order setting forth detailed information justifying his request for fees.

This memorandum of decision contains the court's Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure. *See Rucker v. Higher Educational Aids Board,* 669 F.2d 1179, 1183–84 (7th Cir. 1982).

CONCLUSION

Plaintiff has established by a preponderance of the evidence that his discharge was discriminatory, in violation of Title VII and § 1981. Defendant is ORDERED to pay the plaintiff $16,273.08 for lost wages; $5,000.00 for emotional distress; and $2,391.02 for prejudgment interest. Plaintiff is ORDERED to file a motion for fees and costs within twenty (20) days from the date of this order, detailing his request for fees and costs.