IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
July 14, 2015 Session

**STATE OF TENNESSEE v. BRIAN PILLOW**

**Direct Appeal from the Circuit Court for Maury County**
**No. 22130     Stella Hargrove, Judge**

---

**No. M2014-01355-CCA-R3-CD – Filed March 31, 2016**

---

A Maury County Circuit Court Jury convicted the Appellant, Brian Pillow, of three counts of selling .5 grams or more of cocaine in a drug-free zone. The trial court imposed a total effective sentence of twelve years in the Tennessee Department of Correction. On appeal, the Appellant contends that the trial court erred by requiring the Appellant to expose his tattooed arms to the jury and by admitting photographs of his tattoos into evidence. Additionally, the Appellant challenges the sufficiency of the evidence sustaining his convictions. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ALAN E. GLENN, JJ., joined.

George Clark Shifflett, III (on appeal) and Brian Johnson (at trial), Columbia, Tennessee, for the Appellant, Brian Pillow.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Mike Bottoms, District Attorney General; and Brent A. Cooper, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

At trial, Columbia Police Detective Jason Dark testified that in May 2012, Kevin Odie, a "street-level" drug dealer, was charged with narcotics offenses. Thereafter, Odie approached the District Attorney General and offered to work as a confidential informant in an attempt to obtain leniency on his charges. Odie spoke with Detective Dark about purchasing drugs from certain individuals, including the Appellant.

Detective Dark said that Odie purchased crack cocaine from the Appellant on three occasions: May 2, 2012; May 4, 2012; and May 11, 2012. The procedures before and after each transaction were largely identical. Odie telephoned the Appellant, who agreed to sell the drugs and gave directions to a specific location. Immediately after each call, officers searched Odie and his vehicle to ensure he had no contraband. The officers photocopied the money to be used during the purchase then gave Odie the cash to purchase two grams of cocaine. On May 2, Odie was given $100; on May 4, he was given $130; and on May 11, he was given $150. Detective Dark did not know why the price continually increased.

Detective Dark recalled that before each transaction, Odie was equipped with an audio/video recording device. The recording equipment was set up so that Detective Dark could hear the transaction as it occurred, but he could not view the video until he recovered the device from Odie and downloaded the recording to a computer.

Detective Dark said that after being searched and given money, Odie drove to 501 Martin Drive as directed by the Appellant. The location was approximately 698 feet from Fairview Park. The May 2 purchase occurred in a shed on the property, the May 4 purchase occurred in the yard, and the May 11 purchase occurred inside a maroon sport utility vehicle (SUV) that was parked in the driveway. Detective Dark said that the SUV was registered to Tonya Perry, who had "associated with" the Appellant.

Detective Dark said that after each purchase, Odie met with the police and gave them a substance that was packaged in a plastic sandwich baggie and appeared to be crack cocaine. The detective sent the substances to the Tennessee Bureau of Investigation (TBI) crime laboratory for testing. He said that the amount of drugs Odie received was larger than the amount the police typically obtained for the amount of money provided.

On cross-examination, Detective Dark said that the price for one gram of crack cocaine was usually $100; however, Odie received more than two grams during each purchase. Odie was given $150 for the third transaction. After the transaction, Odie returned $10 and explained that he paid $140 for the drugs.

Detective Dark said that prior to each transaction, Odie's vehicle was searched in a well-lit garage. He could not recall whether he or another officer searched the vehicle but

stated that "[i]t's just protocol. It's something we do." He explained that the officers did not "strip search" an informant but that all of the informant's pockets were checked. He did not check inside Odie's socks or shoes because he trusted Odie.

Detective Dark stated that the Appellant was not arrested on the day of the last transaction; however, he was arrested in December 2012 after the grand jury returned an indictment against him. At the time of his arrest, the Appellant was in possession of $1,400 in cash. None of the bills matched the serial numbers of the cash used in the controlled purchases.

Detective Dark said that while working as a confidential informant, Odie made over 100 controlled buys from approximately forty individuals.

Kevin Odie testified that he had three prior felony convictions, two for selling crack cocaine and one for selling marijuana. He also had two pending charges of selling crack cocaine in a school zone and one pending charge of selling marijuana. He volunteered to buy crack cocaine for the police, hoping that his assistance would keep him from being incarcerated.

Odie testified that his nickname was "Kap." He had known the Appellant, whose nickname was "Bear," for approximately one year. Odie's first purchase of crack cocaine from the Appellant occurred on May 2, 2012. On that day, Odie called the Appellant, and they arranged to meet so that Odie could buy one gram of cocaine. The Appellant told Odie the crack cocaine would cost $100. Odie went to the meeting with a woman he "used to call [his] wife." Prior to leaving for the meeting, Odie, his companion, and the inside of the white Ford Explorer Odie was driving were searched by the police. The officers found no money or drugs. The police equipped Odie with recording equipment and provided him with money prior to the transaction. The video recording, which was played for the jury, captured the entire transaction. As the recording was played, Odie explained what was depicted. The video showed Odie driving to the meeting. During the drive, he called the Appellant, who told him to come to a location near Fairview Park. Prior to his arrival, Odie called the Appellant to let him know he was on his way. During the conversation, the Appellant gave directions to his exact location. As they talked, Odie told the Appellant, "'I got a bill,'" which meant $100. The Appellant responded, "'I gotcha,'" and indicated that Odie should "come on." Odie identified his and the Appellant's voices on the recording.

Odie said that after approximately ten or fifteen minutes, he arrived at the designated location. He saw a white house with an unattached brown shed, which he identified on the recording. As he walked toward the shed, the Appellant opened the door. Odie identified the Appellant as the person seen on the recording. Odie stepped inside the shed and saw another man with the Appellant. The Appellant said that he did

not know whether Odie "wanted it soft or hard," meaning powder or crack cocaine, respectively. Odie indicated he wanted crack cocaine. Odie explained that the video showed the Appellant getting the drugs out of a "dope sack." The Appellant weighed the crack cocaine then told Odie, "'I gave you 2.5 [grams],'" which was more than Odie had requested. Odie said that he would "definitely holler back at him again" for more crack cocaine. After the Appellant gave Odie the crack cocaine, Odie put $100 on the table; however, he never saw the Appellant pick up the money. Afterward, Odie returned to the Explorer, called Detective Dark, and advised him that he was on his way to meet with the officers. Odie did not stop anywhere along the way. As soon as he arrived at the designated location, Odie relinquished the crack cocaine to the officers and described the transaction.

Odie said that on May 4, 2012, he again met with the officers prior to meeting with the Appellant.[1] The police searched Odie, his vehicle, and his female companion and set up the recording equipment. The recording of the transaction was played for the jury, during which Odie again explained what was happening and identified the Appellant. Odie said that he thought he was supposed to try to buy a larger amount of crack cocaine. Once in Columbia, Odie called the Appellant, but the Appellant was at a barbershop and promised to call Odie when he left the shop. The Appellant called a short while later and told Odie to return to the location of their previous meeting. When Odie arrived, the Appellant walked toward Odie and handed him a cigarette pack containing crack cocaine. Odie gave the Appellant $130. Odie told the Appellant that he would likely "holler at" him again. When the transaction was complete, Odie called Detective Dark and arranged to meet the officers. Upon arrival, Odie relinquished the drugs and provided details of the encounter.

Odie said that the final purchase took place on May 11, 2012, at the same location near Fairview Park. Once again, the police gave Odie recording equipment and searched Odie and his vehicle before he left. The recording of the transaction was played for the jury, and Odie narrated what transpired on the video. When Odie arrived at the location, the Appellant was sitting in the driver's seat of a maroon SUV, and a man named Huey was sitting in the front passenger seat. Odie got into the backseat of the vehicle. The Appellant handed Odie the crack cocaine without turning around and indicated that he was giving Odie three grams of crack cocaine. Odie told the Appellant he had $150, but the Appellant said the price was only $140. Odie kept $10 and gave the Appellant $140. Afterward, Odie met with the officers, returned the $10, and relinquished the crack cocaine.

---

[1] On cross-examination, Odie stated that he met with the police before and after the transactions at a "garage out there off Main Sail or Impact Drive."

Odie said that during each transaction, he dealt exclusively with the Appellant. The location of the transactions and the price of the drugs were determined by the Appellant.

The State then asked the trial court to have the Appellant "step forward before the jury and display his bare arms to the jury." Following the trial court's instructions, the Appellant removed his long-sleeved shirt, rolled up the sleeves of his t-shirt, and showed his arms, which were tattooed, to the jury.

On cross-examination, Odie said that the State had not promised him anything for his assistance but that he hoped his cooperation would work in his favor on his pending charges. He acknowledged that he made thirty or forty controlled drug buys for the police and that the purchases were made from several individuals.

On redirect, Odie acknowledged that he was in "big trouble" as a result of his pending charges and that he had volunteered to help the State, hoping he could avoid returning to prison. He stated, however, that the State never asked him to purchase drugs specifically from the Appellant. Odie said that he did not see the Appellant pick up the money during the first transaction; however, he left the money on the table for the Appellant in exchange for the crack cocaine.

After Odie testified, the parties stipulated that Fairview Park was a drug free zone pursuant to Tennessee Code Annotated section 39-17-432(b)(1).

Brett Trotter, a forensic scientist with the TBI, testified that he received three separate packages from the Columbia Police Department. Each package contained a plastic sandwich bag containing crack cocaine. The first bag contained 2.39 grams, the second bag contained 2.56 grams, and the third bag contained 2.90 grams.

The jury found the Appellant guilty of three counts of selling .5 grams or more of cocaine in a drug-free zone. The trial court imposed concurrent sentences of twelve years for each offense. On appeal, the Appellant contends that the trial court erred by requiring the Appellant to expose the tattoos on his arms to the jury and by admitting still photographs of his tattoos into evidence. Additionally, the Appellant challenges the sufficiency of the evidence sustaining his convictions.

## II. Analysis

### A. Evidentiary Issues

The record reveals that at the beginning of the second day of trial, before the jury was called into the courtroom, the State informed the trial court that it planned to

introduce still photographs of the Appellant's face and the tattoos on his arm. The photographs had been taken directly from the videos of the transactions. The State explained that all three videos showed the distinctive tattoos on the Appellant's right arm. However, only the video of the first transaction clearly showed the Appellant's face. The State advised the trial court that it intended to ask the Appellant to roll up his right sleeve to allow the jury to see the tattoos on his arm. The State argued that the photographs and the tattoos would verify the Appellant's identity as the seller of the crack cocaine on all three occasions.

The State cited Black v. State, 479 S.W.2d 656, 658 (Tenn. Crim. App. 1972); State v. Henderson, 623 S.W.2d 638, 641 (Tenn. Crim. App. 1981); and State v. Alejandro Rivera, No. E2002-00491-CCA-R3-CD, 2003 WL 22843170, at *20 (Tenn. Crim. App. at Knoxville, Dec. 1, 2003), in support of its position that having the Appellant show the tattoos on his arm to the jury was permissible and that it did not violate the Appellant's Fifth Amendment right against self-incrimination.

The trial court asked the State if the tattoos were visible on the still photographs and on the videos. The State responded that when the video was viewed at "regular speed," the tattoos were visible but that no distinctive patterns or identifying characteristics could be discerned. The trial court stated, "Well, I'm not so sure that his Fifth Amendment rights aren't violated, if we can't see [any identifying characteristics of the tattoos] on the video."

Defense counsel argued that, pursuant to Tennessee Rule of Criminal Procedure 16, the photographs were not admissible because the State had not disclosed the photographs prior to trial and that the issue should have been raised prior to trial. The State disagreed, maintaining that Rule 16 did not require the State to provide the photographs, only the videos. The trial court initially agreed with defense counsel, asserting that "it's not fair it comes so late. It's almost like an ambush." The trial court also stated, "I'm not going to allow photos that are still photos from a video that's not clear to be introduced into evidence. I think it violates his Fifth Amendment rights, and I'm not going to allow it."

During Odie's testimony, the State began showing the videos of the transactions. After a sidebar, which was not transcribed for the record, the trial court allowed the State to pause each video at certain points to show more clearly the Appellant's face and tattoos. Additionally, the trial court allowed the still photographs to be admitted as exhibits.

After the videos were played, the jury went to lunch. Before the jury reentered the courtroom, the trial court told defense counsel, "I'm fixing to throw you a big curve. I wanted you to know that. It's hard for a judge to reverse themselves, but I think I'm

wrong. I should have reserved the issue." The trial court stated that it had thought the Appellant's tattoos were not visible until "you've messed with that video and slowed it down. That's not the case." The trial court said that its research of case law on the issue revealed that requiring a defendant to show his tattoos did not violate the defendant's Fifth Amendment right against self-incrimination.

The trial court also explained that initially it thought defense counsel had not seen the still photographs until the second day of trial. However, the trial court discovered that on the first day of trial, the State informed defense counsel of its intent to introduce still photographs taken from the videos. The trial court asked defense counsel to confirm whether he had "an opportunity to see these pictures before trial." Defense counsel responded that he was shown the photographs on the first day of trial but that he was not aware the State planned to have the Appellant show his arms to the jury. The trial court held that notice was not required by Rule 16 and that the only issue was whether the Appellant's Fifth Amendment rights against self-incrimination would be violated.

Defense counsel also contended that the Appellant's identity had been established by the videos and that the photographs and the jury's viewing the tattoos were cumulative evidence. The trial court disagreed, noting that the Appellant appeared to have lost weight.

1. Tattoos

On appeal, the Appellant contends that requiring him to show his tattoos was testimonial for the purposes of the Fifth Amendment; therefore, the trial court violated his Fifth Amendment right against self-incrimination. The Appellant also complains about the manner in which the trial court ordered him to show his tattoos, namely requiring him to remove his shirt. The State responds that the trial court did not err. We agree with the State.

Both the United States and Tennessee Constitutions provide that no individual should be compelled to give evidence against himself. See U.S. Const. Amend. V; Tenn. Const. art. I, § 9; State v. Crump, 834 S.W.2d 265, 268 (Tenn. 1992). Our supreme court has explained, however, that "the Fifth amendment applies only to testimonial or communicative evidence[.]" State v. Walton, 41 S.W.3d 75, 87 (Tenn. 2001). This court has also noted that the Supreme Court has held that "'the privilege [against self-incrimination] is a bar against compelling "communications" or "testimony," but that compulsion which makes a suspect or accused the source of "real or physical evidence" does not violate it.'" State v. Reginald Henderson, No. W2000-00607-CCA-R3-CD, 2001 WL 912759, at *10 (Tenn. Crim. App. at Jackson, Aug. 10, 2001) (quoting Schmerber v. California, 384 U.S. 757, 764 (1966)).

First, we will address the Appellant's contention that requiring him to show his tattoos to the jury violated his Fifth Amendment rights. We note that in State v. Henderson, 623 S.W.2d 638, 641 (Tenn. Crim. App. 1981), this court stated that a defendant's Fifth Amendment right against self-incrimination was not violated by a trial court's ordering the defendant to display a distinctive arm tattoo to the jury. Moreover, this court explained that

> at trial an accused may be required to stand, remove a veil, visor, mask or glasses, put on a wig and sunglasses, exhibit his hands, *roll up his sleeve to show a tattoo*, submit to the taking of his fingerprints, remove his coat and shirt to show scars, allow inspection of his face for identifying marks, move his feet into view or put on a garment, hat or cap.

State v. Rodriguez, 752 S.W.2d 108, 112 (Tenn. Crim. App. 1988) (emphasis added) (citing Wharton's Criminal Evidence, § 624, pp. 219-221 (13th ed.)); see State v. Torrez Talley, No. W2003-02237-CCA-R3-CD, 2006 WL 2947435, at *15 (Tenn. Crim. App. at Jackson, Oct. 16, 2006) ("[T]he trial court has discretion to allow a jury to view certain aspects of a defendant's physical appearance, such as tattoos or scars."). In making this statement, this court implicitly stated that displaying aspects of an accused's physical appearance was demonstrative and non-testimonial evidence. Rodriguez, 752 S.W.2d at 112-13.

The Appellant acknowledges that the exhibition of the tattoos "may be" non-testimonial when performed for identification purposes; he contends, however, that it "is testimonial insofar as it requires him to communicate certain non-identi[t]y related information as a witness against himself that is embodied in the tattoos themselves." He contends that his tattoos were inherently communicative because they "non-verbally state[d], 'These are *my* tattoos; this is the kind of tattoo that I like; these are the tattoos that guys like me get.'" We do not discount the possibility that a tattoo could be considered testimonial if the government used the tattoo "not as an 'identifying physical characteristic' but for the 'content of what [was] written.'" United States v. Greer, 631 F.3d 608, 613 (2d Cir. 2011) (quoting Gilbert v. California, 388 U.S. 263, 266-67 (1967)). However, in the instant case, the State used the Appellant's tattoos solely for the purpose of identification. Again, we note that this court repeatedly has held that when identification was an issue, requiring a defendant to display tattoos to the jury did not violate the defendant's Fifth Amendment rights against self-incrimination. See Talley, No. W2003-02237-CCA-R3-CD, 2006 WL 2947435, at *15; Rivera, No. E2002-00491-CCA-R3-CD, 2003 WL 22843170, at *20; State v. Mitchell Ware, No. 243, 1986 WL 652, at *1 (Tenn. Crim. App. at Knoxville, Jan. 7, 1986).

Next, we will address the Appellant's complaint about the manner in which the trial court ordered him to show his tattoos. The Appellant contends that the trial court's requiring him to show his bare arms made him "exhibit himself in a manner that was inconsistent with how he may have appeared in public, and said demonstration was not an important element in the determination of his identification." Although the Appellant did not cite any law to support this proposition, we note that similar language is used in State v. Sanders, 691 S.W.2d 566, 568 (Tenn. Crim. App. 1984), in which this court observed that "a defendant may be required to exhibit himself in any manner which an ordinary person is commonly seen in public[.]" The Appellant maintains that

> the court's requirement that he display his bare arms was . . . demeaning to [him] because this is not the manner that [a] person is commonly seen in public. Specifically, persons are not commonly seen in public rolling up their sleeves to display distinctive tattoos. This very act by its very specific nature is uncommon. . . . For the purposes of this analysis, this Court should ignore the fact that [the Appellant] appeared in the videos without wearing a shirt because those videos were clearly in the context of a non-public setting.

In our view, however, the Appellant's exposing his arms was not exhibiting himself in a way not commonly seen in public. Short-sleeved shirts and tank tops are common items of clothing that display a person's arms. See United States v. Murphree, 497 F.2d 395, 396-97 (9th Cir. 1974) ("Exposure of the arms in public is a common practice for the vast majority of persons living in this country. To that vast majority there is no loss of dignity or significant intrusion into privacy in exposing the arms.").

Finally, the Appellant contends that Odie and Detective Dark identified him at trial and that using his tattoos for identification purposes was prejudicial and was cumulative evidence. Nonetheless, at trial, the court noted that the Appellant appeared to have lost weight since the offenses and that the tattoos may confirm the Appellant's identity as the seller. See State v. Whitt, 753 S.W.2d 369, 370 (Tenn. Crim. App. 1988). Based upon the foregoing, we conclude that the trial court did not err in instructing the Appellant to show his tattooed arm to the jury.

## 2. Photographs

Next, the Appellant contends that the trial court erred by allowing the State to introduce still photographs of the Appellant's face and tattooed arm in violation of Rule 16. The State argues that this issue was waived because it was not included in the Appellant's written motions for new trial and that, regardless, plain error relief is not

warranted.[2] The Appellant did not respond to the State's claim of waiver. We agree with the State.

At the hearing on the motion for new trial,[3] defense counsel mentioned that the admissibility of the photographs was an issue at trial. However, defense counsel did not argue about the admissibility of the photographs but instead focused on whether the trial court erred by requiring the Appellant to remove his shirt and show his tattoos to the jury. Tennessee Rule of Appellate Procedure 36(b) provides in pertinent part that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal."

We may only consider an issue as plain error when all five of the following factors are met:

> a) the record must clearly establish what occurred in the trial court; b) a clear and unequivocal rule of law must have been breached; c) a substantial right of the accused must have been adversely affected; d) the accused did not waive the issue for tactical reasons; and e) consideration of the error is "necessary to do substantial justice."

State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); see also State v. Smith, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the Adkisson test for determining plain error). Furthermore, the "plain error must be of such a great magnitude that it probably changed the outcome of the trial." Adkisson, 899 S.W.2d at 642 (internal quotation marks and citation omitted).

We conclude that consideration of the issue is not necessary. All of the evidence adduced at trial pointed to the Appellant as the seller of the crack cocaine. Specifically, his face was discernable on the videos, and Odie identified the Appellant as the seller at trial. Therefore, consideration of the issue is not necessary to do substantial justice. Accordingly, we conclude that the Appellant is not entitled to plain error review.

## B. Sufficiency of the Evidence

---

[2] We note that "[e]ffective July 1, 2009, Rule 52 of the Tennessee Rules of Criminal Procedure was 'deleted because harmless error and plain error are covered in amended Tennessee Rule of Appellate Procedure 36(b).'" State v. Hill, 333 S.W.3d 106, 129 n.4 (Tenn. Crim. App. 2010) (quoting Tenn. R. Crim. P. 52, Advisory Comm'n Cmts.).

[3] The attorney who represented the Appellant at the motion for new trial and on appeal was not the attorney who represented him at trial.

The Appellant's final issue concerns the sufficiency of the evidence sustaining his convictions of three counts of selling .5 grams or more of cocaine in a drug-free zone. On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

Our criminal code provides that it is a Class B felony for a defendant to knowingly sell .5 grams or more of cocaine, a Schedule II controlled substance. Tenn. Code Ann. § 39-17-417(a)(3), (c)(1). If the transaction occurs "within the prohibited zone of a preschool, childcare center, public library, recreational center or park," the offender is subject to an increased fine but not to an increased classification of offense. See Tenn. Code Ann. § 39-17-432(b).

The Appellant contends that the State failed to prove that he "accepted the payment for himself as the seller of the controlled substances during the alleged transactions." The Appellant asserts that "the evidence *may* have been sufficient to show that [the Appellant] acted as an agent for [Odie], but not that he personally sold the controlled substances in question." In support of his argument, the Appellant notes that Odie testified he put money on the table during the first transaction, but he did not see the Appellant pick up the money and that another male was present during two of the transactions. The State contends that the Appellant's claim that the proof did not show he was the actual seller was "belied by the evidence and was rejected by the jury." We agree with the State.

In the light most favorable to the State, the proof adduced at trial revealed that Odie, who was acting as a confidential informant with the Columbia Police Department, arranged to purchase cocaine from the Appellant on three occasions. Before each transaction, the police searched Odie and his vehicle for contraband and found none. The police also supplied Odie with recording equipment and with money to purchase the cocaine. Each transaction occurred approximately 698 feet from Fairview Park. On the first occasion, Odie went to the prearranged location. He placed $100 on a table in front of which the Appellant was standing. The Appellant then handed Odie 2.39 grams of crack cocaine. On the second occasion, the Appellant handed Odie a cigarette pack containing 2.56 grams of crack cocaine. In return, Odie handed the Appellant $130, and the Appellant walked away. On the third occasion, Odie got into the back of an SUV; the Appellant was in the driver's seat. The Appellant reached back and handed Odie 2.90 grams of crack cocaine. The Appellant said that Odie owed only $140. Odie kept $10 and gave the Appellant $140. During each transaction, Odie dealt with the Appellant, and the Appellant always decided where the transaction would take place and the price for the crack cocaine. We conclude that from the foregoing, the jury could have found beyond a reasonable doubt that the Appellant sold .5 grams or more of cocaine in a drug-free zone on three occasions.

## III. Conclusion

Based upon the foregoing, we affirm the judgments of the trial court.

_____
NORMA MCGEE OGLE, JUDGE

- 12 -